1

2  UNITED STATES DISTRICT COURT
   EASTERN DISTRICT OF NEW YORK

3  -------------------------------------------X

4  TINA BRADWAY, Individually and as
   Administratrix of the Estate of

5  TONY BRADWAY,

6                          Plaintiff,

7
                -against-          Civil Action No.
8                                  CV-09 3177

9  THE TOWN OF SOUTHAMPTON, LINDA A. KABOT,
   and JOHN DOES 1-10 Consisting of

10 Individuals to be Determined,

11                         Defendants.

12 -------------------------------------------X

13                     May 24, 2010
                       10:00 a.m.
14
                       110 Old Riverhead Road
15                     Hampton Bays, New York

16

17         DEPOSITION of THE TOWN OF SOUTHAMPTON,

18 a Defendant herein, by POLICE OFFICER ERIC

19 SICKLES, taken by the Plaintiff, pursuant to

20 Federal Rules of Civil Procedure, and Notice,

21 held at the above-mentioned time and place,

22 before Lori Anne Curtis, a Notary Public of the

23 State of New York.

24

25        '

2    A P P E A R A N C E S:

3

4

5            RUSKIN, MOSCOU & FALTISCHEK, INC.
                Attorneys for Plaintiff
6                1425 RXR Plaza
                Uniondale, New York   11556
7            BY:  THOMAS TELESCA, ESQ.

8

9            DEVITT SPELLMAN BARRETT, LLP
                Attorneys for Defendants
10               50 Route 111
                Smithtown, New York   11787
11           BY:  JELTJE DEJONG, ESQ.

12

13           ALSO PRESENT:

14               Police Officer Vincent Cagno

15

16

17

18

19

20

21

22

23

24

25

1

2

3                  FEDERAL STIPULATIONS

4

5          IT IS HEREBY STIPULATED AND AGREED by

6    and between the parties hereto, through their

7    respective counsel, that the certification,

8    sealing and filing of the within examination

9    will be and the same are hereby waived;

10         IT IS FURTHER STIPULATED AND AGREED

11   that all objections, except as to the form of

12   the question, will be reserved to the time of

13   the trial;

14         IT IS FURTHER STIPULATED AND AGREED that

15   the within examination may be signed before any

16   Notary Public with the same force and effect as

17   if signed and sworn to before this Court.

18

19

20

21

22

23

24

25

Case 2:09-cv-03177-JFB-ARL   Document 24-8   Filed 06/06/11   Page 4 of 50 PageID #: 143

1

2    E R I C    S I C K L E S, the Witness herein,

3           having been first duly sworn by a Notary

4           Public in and of the State of New York,

5           was examined and testified as follows:

6    EXAMINATION BY

7    MR. TELESCA:

8           Q      Would you please state your full

9    name for the record.

10          A      Eric Sickles, S-I-C-K-L-E-S.

11          Q      What is your current business

12   address?

13          A      110 Old Riverhead Road, Hampton

14   Bays, New York 11946.

15                     MR. TELESCA:   Good morning,

16                 Officer Sickles.   We met

17                 informally.   My name is Tom

18                 Telesca.   I represent Tina

19                 Bradway, who is bringing a suit on

20                 behalf of her deceased son, Tony

21                 Bradway, against the Town of

22                 Southampton and individual members

23                 of the police department, such as

24                 yourself.

25                     THE WITNESS:   Okay.

PO E. Sickles

1

2          Q      Have you ever been deposed before?

3          A      Yes.

4          Q      How many times?

5          A      Approximately three.

6          Q      Have they involved personal

7    matters or matters regarding the police

8    department?

9          A      Both.

10         Q      How many times with regard to your

11   work?

12         A      One other time.

13         Q      And that was your work as a police

14   officer?

15         A      Yes.

16         Q      Did that deposition involve a case

17   where there was an allegation of the use of

18   excessive force?

19         A      No.

20         Q      Okay.

21               How about, was there an allegation

22   in that case that involved the alleged failure

23   of somebody to get medical care?

24         A      No.

25               MR. TELESCA:   Okay.

Case 2:09-cv-03177-JFB-ARL   Document 24-8   Filed 06/06/11   Page 6 of 50 PageID #: 145

```
 1                              PO E. Sickles

 2                          So you understand kind of

 3                    the rules of the road for today.

 4                    There is a court reporter who's

 5                    going to transcribe everything

 6                    that's said to create a written

 7                    record.

 8                          THE WITNESS:  Uh-hum.

 9                          MR. TELESCA:  So it's

10                    important that you answer

11                    verbally, not nod your head.  It's

12                    also important that you don't

13                    guess; that if you don't know the

14                    answer, it's okay to say "I don't

15                    know," or if you would like to

16                    give a range, for example, if I

17                    ask you, you know, what time did

18                    you do X, you can say,

19                    "approximately," you know, "I'm

20                    not sure," but you can give a

21                    range, but just qualify and let us

22                    know that, but please don't guess.

23                          THE WITNESS:  Okay.

24                          MR. TELESCA:  If there's a

25                    word I use or a term that's not
```

PO E. Sickles

2          clear to you or if I'm using the

3          wrong term, I'd ask that you ask

4          me to clarify what I'm saying.  If

5          there's a question that you don't

6          understand, it's perfectly okay

7          for you to say to me "I don't

8          understand what your question is."

9                    THE WITNESS:  Okay.

10                   MR. TELESCA:  If you answer

11         a question, I'll assume that you

12         heard it, that you understood it

13         and that you answered it

14         accurately to the best of your

15         ability today.

16                   THE WITNESS:  Okay.

17                   MR. TELESCA:  If at any

18         time you need a break -- you need

19         to use the restroom, make a call,

20         whatever reason -- I just ask that

21         you answer a pending question, and

22         then you can take as much time as

23         you need.

24                   THE WITNESS:  Okay.

25                   MR. TELESCA:  And if at any

```
 1
 2                    time your attorney places an
 3                    objection to one of my questions,
 4                    I'd ask that you stop speaking and
 5                    allow her to place her objection
 6                    on the record, and if we need to
 7                    work something out, please allow
 8                    us to do that.
 9                         THE WITNESS:  Okay.
10         Q     Okay.
11               Is there any reason why you cannot
12    testify truthfully today?
13         A     No.
14         Q     Did you review any documents in
15    preparation for today's deposition?
16         A     Yesterday.
17         Q     Okay.
18               What did you review?
19         A     I browsed my supplemental report.
20         Q     Did you review any other reports?
21         A     No.
22         Q     Did you review your use of force
23    report?
24         A     No.
25         Q     Other than your attorney or any
```

Case 2:09-cv-03177-JFB-ARL Document 24-8 Filed 06/06/11 Page 9 of 50 PageID #: 148
PO E. Sickles

1

2    other attorney at Ms. DeJong's firm, did you

3    speak with anyone concerning today's testimony?

4              A    Yes.

5              Q    Who did you speak with?

6              A    Sergeant James Kiernan.

7              Q    And when did you speak to him?

8              A    Yesterday.

9              Q    What did you speak about?

10             A    He wanted me to bring -- turn over

11   drugs later on in the day, and he just basically

12   told me that this shouldn't take longer than two

13   hours or so.

14             Q    Okay.

15                  Did you speak about the substance

16   of his deposition last week?

17             A    No.

18             Q    Okay.

19                  Did you speak with anybody else?

20             A    No.

21             Q    So did you speak with --

22                       MR. TELESCA:   And I want to

23                  pronounce your (indicating) name.

24                  Is it Cagno?

25                       OFFICER CAGNO:   Cagno.

PO E. Sickles

2        Q    Did you speak with Officer Cagno?

3        A    No.

4        Q    How about Officer Peters?

5        A    No.

6        Q    Officer Frankenbach?

7        A    No.

8        Q    Officer William Kiernan?

9        A    No.

10       Q    Okay.

11            How about Officer Montalbano?

12       A    No.

13       Q    I assume you graduated from high

14  school?

15       A    Yes.

16       Q    Where did you go to high school?

17       A    William Floyd High School in

18  Mastic.

19       Q    Did you attend any college?

20       A    Yes.

21       Q    Where?

22       A    Suffolk Community.

23       Q    And did you get a degree?

24       A    No.

25       Q    How many years did you attend

Case 2:09-cv-03177-JFB-ARL  Document 24-8  Filed 06/06/11  Page 11 of 50 PageID #: 150

PO E. Sickles

```
 1
 2   Suffolk Community?
 3          A      One semester.
 4          Q      What year did you graduate from
 5   William Floyd High School?
 6          A      '93.
 7          Q      Okay.
 8                 And you attended Suffolk, you
 9   said, one semester.  Was that the following fall
10   after high school graduation?
11          A      Yes.
12          Q      Okay.
13                 After you left Suffolk Community
14   College, what did you do professionally?
15          A      Security.
16          Q      Where did you work?
17          A      I worked in an airline hanger for
18   Warner Brothers in Bohemia.
19          Q      When did you start working there?
20          A      I don't know the years.  I don't
21   recall.
22          Q      Do you recall about how long after
23   you left Suffolk Community it was?
24          A      Maybe six months or so.
25          Q      Okay.
```

1

2              And how long did you work there?

3      A     A year.

4      Q     And what did you do next

5  professionally?

6      A     I worked at a propane company.

7      Q     What company?

8      A     Vitali.

9      Q     And where was that located?

10     A     Bohemia.

11     Q     And how long did you work there?

12     A     Approximately a year.

13     Q     Okay.

14              What did you do after that for

15  employment?

16     A     I worked as a part-time police

17  officer.

18     Q     Where did you do that?

19     A     Southampton Town and Quogue

20  Village.

21     Q     When you say "part-time police

22  officer," how is that different from a full-time

23  police officer in terms of your job

24  responsibilities?

25     A     It's really not.  It's a police

Case 2:09-cv-03177-JFB-ARL   Document 24-8   Filed 06/06/11   Page 13 of 50 PageID #: 152

1  PO E. Sickles

2    officer status, but it's seasonal work.

3         Q      So before you became -- and let me

4    start from the beginning.

5               Do you recall what year you became

6    a part-time police officer?

7         A      1999.

8         Q      Okay.

9               And before you were employed as a

10   part-time police officer, did you go to a police

11   academy?

12        A      Yes.

13        Q      Where did you go to a police

14   academy?

15        A      In Nesconset, New York.

16        Q      And that was Suffolk --

17        A      Suffolk County Police Academy.

18        Q      And when you were working part

19   time, did you work at Southampton first or

20   Quogue Village?

21        A      Southampton.

22        Q      And that was in 1999?

23        A      Yes.

24        Q      And you were a uniformed officer?

25        A      Yes.

1                         PO E. Sickles

2          Q     When did you start working for the

3    Quogue Village Police Department?

4          A     I'd say approximately six months

5    after I was hired here, so --

6          Q     Okay, so were you -- are you

7    finished?

8          A     No.

9                Also in the same village.

10         Q     Okay, so were you working for both

11   the Town of Southampton and Quogue Village at

12   the same time?

13         A     Yes.

14         Q     And when you say "seasonal," is

15   that for the summer?

16         A     Yes.

17         Q     Okay.

18               So during which months were you

19   hired for?

20         A     For anywhere from the end of May

21   until the beginning of September.

22         Q     And both Southampton and Quogue

23   Village, you were a uniformed police officer?

24         A     Yes.

25         Q     Did you patrol in a car?

1                          PO E. Sickles

2           A      Yes.

3           Q      And for how long were you a

4    part-time officer?

5           A      I believe it was two seasons -- or

6    maybe one season, one summer.

7           Q      So that would be the summer of

8    '99?

9           A      Yes.

10          Q      And after that, were you hired

11   full time?

12          A      Yes.

13          Q      By Southampton or Quogue Village

14   or both?

15          A      By Southampton.

16          Q      Okay.

17                 So that was approximately 2000?

18          A      Yes.

19          Q      When you were hired full time by

20   the Southampton Town Police Department, what was

21   your role?  Were you still a uniformed police

22   officer?

23          A      Yes.

24          Q      Okay.

25                 And as a uniformed police officer,

1                          PO E. Sickles

2      full time, for the Town of Southampton, what

3      were your job responsibilities?

4              A       To answer radio calls, enforce the

5      Vehicle and Traffic Law and Penal Law.

6              Q       And you were in a squad car?

7              A       Yes.

8              Q       And today you are not a uniformed

9      police officer anymore?

10             A       No.

11             Q       At what point did you -- what's

12     your current position?

13             A       I work for the Street Crime Unit.

14             Q       Okay.

15                     And when did you start working for

16     the Street Crime Unit?

17             A       2003.

18             Q       Between 2000 and 2003 did you have

19     any other position other than a uniformed

20     officer and working for the Street Crime Unit?

21             A       I was a member of the Emergency

22     Services Unit.

23             Q       Okay.

24                     And what does that mean?

25             A       It's a S.W.A.T. team.

1

2      Q       Now, is that distinct from being a

3   uniformed officer or is it something in addition

4   to being a uniformed officer?

5      A       In addition to.

6      Q       Okay.

7              And how were you selected to work

8   for Emergency Services?

9      A       They pick you --

10     Q       Who picked you?

11     A       -- they vote on you.

12             The team.

13     Q       Who's "the team"?

14     A       Other members of the department.

15     Q       Of the Emergency Services

16  department?

17     A       Yes.

18     Q       So are you selected based on your

19  performance as a uniformed officer?

20     A       Yes.

21     Q       Are you still a member of the

22  Emergency Services Team?

23     A       No.

24     Q       Okay.

25             So is it considered a promotion to

 2    be selected for the Emergency Services Team?

 3              A      No.

 4              Q      And then can you describe to me

 5    the process by which you became a member of the

 6    Street Crime Unit?

 7              A      There were -- we have a blackboard

 8    with transfers and things of that nature, and I

 9    believe they were asking for letters of

10    interest, so I put in a letter of interest and I

11    was selected.

12              Q      Okay.

13                     So essentially the department has

14    openings, and you apply for an opening?

15              A      Yes.

16              Q      Do you recall when you applied for

17    the Street Crimes Unit?

18              A      No, I don't recall.

19              Q      Did you apply only one time and

20    get accepted?

21              A      Yes.

22              Q      Let's go back to when you were at

23    the police academy.  Was that in or about 1998?

24              A      Yes.

25              Q      Okay.

PO E. Sickles

2          And can you describe for me your

3   training at the police academy.

4          A      Sure.   We had classroom sessions,

5   which included blocks on laws of arrest, deadly

6   physical force, Vehicle and Traffic Law, Penal

7   Law, we also had firearms training, physical

8   agility training, defensive tactics training.

9          Q      Okay, so it's safe to say that it

10  covered all bases necessary for becoming a

11  police officer?

12         A      Yes.

13         Q      Okay.

14          While you were at the police

15  academy, did you take any specialized courses?

16         A      No.

17         Q      So everybody that was in your

18  class took the same courses?

19         A      Yes.

20         Q      Okay.

21          As part of your training at the

22  police academy, did it include training on when

23  you should take an arrestee to the hospital as

24  opposed to bringing them to headquarters after

25  an arrest?

PO E. Sickles

```
 2         A      I don't recall.
 3         Q      Do you recall ever having such
 4    training?
 5         A      No.
 6         Q      When you became a member of the
 7    Emergency Services Team, did that require
 8    additional attendance at the police academy or
 9    at some other training facility?
10         A      Yes.
11         Q      Where was that?
12         A      Suffolk County Range.  It was a
13    Suffolk County Basic S.W.A.T. School.
14         Q      And how long did that take?
15         A      Two weeks.
16         Q      Was that two weeks full time or
17    while you were still working as a police
18    officer?
19         A      While I was still working.
20         Q      Was it during the time you were on
21    your days off or --
22         A      No, you are assigned there.
23         Q      Okay.
24                So you weren't working your normal
25    schedule.
```

PO E. Sickles

```
 2         A      No, no.

 3         Q      Okay.

 4                And that two-week course, what did

 5    it entail?

 6         A      Entries into residences, defensive

 7    tactics, firearms, stuff of that nature.

 8         Q      And that would be part of a

 9    S.W.A.T. Team that I would see on TV?

10         A      Yes.

11                     MS. DEJONG:   I'll object to

12                the form of the question.

13                     MR. TELESCA:   Off the

14                record.

15                     (Discussion held off the

16                record.)

17                     MR. TELESCA:   Back on the

18                record.

19         Q      And then when you were accepted as

20    a member of the Street Crimes Unit, did that

21    also require additional training?

22         A      Yes.

23         Q      And where did that training take

24    place?

25         A      I've attended several schools with
```

Case 2:09-cv-03177-JFB-ARL  Document 24-8  Filed 06/06/11  Page 22 of 50 PageID #: 161

1    PO E. Sickles

2    the Street Crime Unit in various places.

3         Q    Okay.

4              Is that over the course of the

5    time you were a member of the Street Crimes

6    Unit?

7         A    Yes.

8         Q    I just want to know about the

9    training you received before you became a

10   member.

11        A    None.

12        Q    None?

13        A    None.

14        Q    So you are just selected?

15        A    Yes.

16        Q    And at that point, you no longer

17   wore a uniform on a daily basis?

18        A    No.

19        Q    So are you considered an

20   undercover officer?

21        A    Yes.

22        Q    Now -- I may have asked this, but

23   I just want to be sure that it's clear -- up

24   until today, did you ever have any formal

25   training either in a classroom or some other

1    PO E. Sickles

2    type of setting where you were advised on when

3    you should take an arrestee to the hospital or

4    for other medical treatment as opposed to

5    bringing that arrested person to headquarters

6    for whatever, booking or whatever it is.

7                    MS. DEJONG:  I'm objecting

8                    to the form, but you can answer

9                    that.

10                    Are we talking EMT

11                    training?  There's a lot of

12                    different training.  Are you

13                    talking specifically --

14                    MR. TELESCA:  No, as a

15                    police officer.

16        Q    So, for instance, is there a

17    classroom session or handout pamphlet in a book

18    where it said "under X circumstances, you should

19    attempt to bring the arrested person for medical

20    service as opposed..."

21        A    There were situations where they

22    would tell us that we would bring somebody to a

23    hospital.

24        Q    And that was part of your formal

25    training?

PO E. Sickles

2        A       I believe with the EMT classes,

3    they were teaching that.

4        Q       Now, yesterday, I reviewed your

5    personnel file that was produced by your

6    attorneys, and as part of that, I saw that you

7    had a certificate for EMT training.

8        A       Yes.

9        Q       Okay.

10               Now, is that something that every

11   police officer has?

12       A       Yes.

13       Q       Okay.

14               And how would you describe the EMT

15   training?  What is entailed?

16       A       It's basic CPR instructions and a

17   practical course, where you demonstrate

18   procedures in CPR and first aid.

19       Q       So, it's a -- I don't want to

20   underplay what it is, but essentially it's how

21   to administer first aid?

22       A       Yes.

23       Q       Okay.

24               And in the course of your duty if

25   you arrest somebody who is injured or otherwise

```
 1                          PO E. Sickles
 2   sick, are you trained to take that person
 3   directly to the hospital for medical care or are
 4   you trained to bring them to headquarters?
 5         A      It depends on the situation.
 6         Q      Okay.
 7                Under what circumstances would you
 8   bring somebody directly to the hospital?
 9         A      If they appear to be in distress
10   or requesting to go to the hospital.
11         Q      Would a potential overdose be a
12   sign of distress?
13                     MS. DEJONG:  Objection, but
14                go ahead, if you can answer it.
15         A      If they were showing signs of
16   distress, yes.
17         Q      I guess what I want to know, in
18   particular if an arrestee was showing that they
19   were overdosing, would that be a sign of
20   distress that would lead you to take them
21   directly to the hospital?
22         A      Yes.
23                     MR. TELESCA:  Let's mark
24                this -- we're up to Plaintiff's 7,
25                I believe.
```

PO E. Sickles

```
 2              MS. DEJONG:  Yes.

 3                   (Plaintiff's Exhibit 7,

 4              First Responder Certificate, was

 5              marked for identification, as of

 6              this date.)

 7         Q    Officer Sickles, do you recognize

 8   this document (handing)?

 9         A    (Witness peruses document.)

10              Yes.

11         Q    Can you tell me what it is?

12         A    It's a First Responder

13   certificate.

14         Q    And it was issued on May 19, 1999?

15         A    Yes.

16         Q    So was this certificate obtained

17   by you at or about the time that you became a

18   police officer?

19         A    This one is through Quogue

20   Village.

21         Q    Okay.

22              In addition, do you have another

23   First Responder certificate?

24         A    Whatever I received in the police

25   academy, whatever training I received there.
```

1      PO E. Sickles

2  This is in addition to.

3          Q      So this is separate from the First

4  Responder training you got while at the police

5  academy?

6          A      Yes.

7          Q      Do you recall if this -- and I'm

8  speaking about Plaintiff's Exhibit 7 -- did the

9  training that was required in order to get the

10  First Responder certificate from Quogue Village,

11  did that include anything different than what

12  you learned through the police academy, if you

13  can recall?

14          A      I'm not sure.

15          Q      Okay.

16                  Is part of your First Responder

17  training, whether it was through the police

18  academy or through Quogue Village or through

19  some other entity, did that include how to

20  administer first aid to somebody who was

21  intoxicated or overdosing?

22          A      Yes.

23          Q      Okay.

24                  And can you describe for me, if

25  you can, what steps should be taken if a person

PO E. Sickles

1
2   is overdosing?
3          A      We'd usually administer some
4   oxygen, call for an ambulance to come.
5          Q      So other than administering
6   oxygen, is there anything else you can do?
7          A      No.
8          Q      Also when I was looking through
9   your personnel file yesterday, I noticed that
10  you have, I think, two certificates for the use
11  of a Taser?
12         A      Yes.
13         Q      Are you certified to use a Taser?
14         A      Yes.
15         Q      Okay.
16                Can you tell me what a Taser is?
17         A      A Taser is an electronic stun gun.
18         Q      And under what circumstances would
19  you use a Taser?
20         A      Various -- there's various things
21  we'd use it for.  We'd use it for less than
22  lethal compliance from a subject, suicidal
23  subjects to gain compliance, combative subjects.
24         Q      Okay.
25                Does the Town of Southampton have

Case 2:09-cv-03177-JFB-ARL   Document 24-8   Filed 06/06/11   Page 29 of 50 PageID #: 168
PO E. Sickles

 1

 2   any guidelines that you are to follow for the

 3   use of a Taser?

 4         A      They explain it through our

 5   training.

 6         Q      Okay.

 7         A      I don't believe there's any

 8   written policy.

 9         Q      Okay.

10                Where were you trained to use the

11   Taser?

12         A      At our range in Westhampton.

13         Q      So the training for the use of the

14   Taser was done by other members of the Town of

15   Southampton Police Department?

16         A      Yes.

17         Q      Okay.

18                      MR. TELESCA:   Let's mark

19                Exhibits 8 and 9.

20                      (Plaintiff's Exhibit 8,

21                "Taser Protect Life" Certificate

22                dated April 14, 2004, was marked

23                for identification, as of this

24                date.)

25                      (Plaintiff's Exhibit 9,

                              PO E. Sickles

 2                    "Taser Protect Life" Certificate

 3                    dated April 22, 2005, was marked

 4                    for identification, as of this

 5                    date.)

 6          Q         Officer Sickles, I'll show you

 7    what's been marked Plaintiff's Exhibit 8

 8    (handing).

 9                    Do you recognize that document?

10          A         (Witness peruses document.)

11                    Yes.

12          Q         What is it?

13          A         Taser certificate.

14          Q         Who issued this certificate?

15          A         William Hughes.

16          Q         I see at the top it says "Taser

17    Protect Life." Do you know if that is -- well,

18    let me start over.

19                    Who manufactures the Taser?

20          A         TASER.

21          Q         And is this the certificate from

22    the company that manufactures the Taser gun?

23          A         I believe it's through a certified

24    instructor that -- someone who is certified

25    through them.

Case 2:09-cv-03177-JFB-ARL  Document 24-8  Filed 06/06/11  Page 31 of 50 PageID #: 170

1

2      Q      Okay.

3             In order to get this certificate,

4  you were trained by Sergeant William Hughes?

5      A      Yes.

6      Q      Other than Sergeant Hughes, did

7  anybody else train you in how to use the Taser?

8      A      No.

9      Q      So there wasn't anybody from the

10  TASER company that was there at the training?

11     A      No.

12     Q      And can you describe for me the

13  training that was necessary in order to receive

14  the certificate, which is again, Plaintiff's

15  Exhibit 8?

16     A      They instruct you on the

17  nomenclature, how the Taser operates, and then

18  you are exposed to the Taser.

19     Q      When you say "nomenclature," what

20  do you mean by that?

21     A      The parts of the Taser, what it's

22  made up of.

23     Q      Do you know how the Taser actually

24  works?

25     A      No.

Case 2:09-cv-03177-JFB-ARL  Document 24-8  Filed 06/06/11  Page 32 of 50 PageID #: 171

2      Q    Okay.

3           Are there different modes of use

4  of a Taser?

5      A    Yes.

6      Q    Okay.

7           And how many modes are there?

8      A    Two.

9      Q    And can you tell me what those two

10  are?

11     A    There's a drive stun mode and

12  there's a cartridge mode.

13     Q    Can you tell me how those two

14  modes, the drive stun mode and cartridge mode,

15  are different?

16     A    The drive stun is direct contact

17  with the actual Taser, and the cartridge mode

18  shoots two prongs that would stick into the

19  subject.

20     Q    When you say "direct contact," do

21  you mean direct contact between the Taser and

22  the --

23     A    And the subject.

24     Q    -- and the subject?

25     A    Yes.  You would touch them with

2   it.

3           Q      And you would touch them -- you

4   would pull the trigger?

5           A      Yes.

6           Q      And what happens?

7           A      It delivers an electric shock.

8           Q      And what does that cause the

9   subject to do, if anything?

10          A      It would deliver a reaction to

11  their nervous system.

12          Q      And what does it cause the subject

13  to do actually, if anything?

14          A      It causes their muscles to tense

15  up.

16          Q      So then does it prevent them from

17  acting on their own volition?

18          A      That's what it's supposed to do.

19          Q      That's what I'm asking.

20          A      That's the purpose, yes.

21          Q      And when you -- in order to

22  receive the certificate marked Plaintiff's

23  Exhibit 8 -- and that certificate is dated

24  April 14, 2004, does that refresh your

25  recollection as to when you had the training for

```
 1
 2   the Taser?
 3        A    Yes.
 4        Q    Now, Plaintiff's Exhibit 8, is
 5   that the first certificate you received for
 6   Taser training?
 7        A    I believe so.
 8        Q    You are not sure, though?
 9        A    I'm not positive, no.
10        Q    And how long was the training?
11   Was it a matter of hours, days, weeks?
12        A    It was an eight-hour course.
13        Q    One day?
14        A    Yes, one-day course.
15        Q    Is each member of the Street
16   Crimes Unit trained in the use of a Taser?
17        A    Yes.
18        Q    Okay.
19             Let me show you now what's been
20   marked Plaintiff's Exhibit 9 (handing).
21             Do you recognize that document?
22        A    (Witness peruses document.)
23             Yes.
24        Q    Can you tell me what it is?
25        A    Taser certificate.
```

1

2      Q      Now, can you tell me what, if

3  anything, was different in the training in order

4  to receive Plaintiff's Exhibit 9 as compared to

5  Plaintiff's Exhibit 8?

6      A      Nothing.

7      Q      Okay, so was it basically the same

8  course again?

9      A      Yes.

10      Q      And was it again about eight

11  hours?

12      A      Yes.

13      Q      So that was eight hours during one

14  day?

15      A      Yes.

16      Q      Okay.

17          Now, Plaintiff's Exhibit 9 is

18  dated April 22, 2005.  Do you see that?

19      A      Yes.

20      Q      And does that refresh your

21  recollection as to about approximately when you

22  had your second training course for the Taser?

23      A      I believe so.

24      Q      Subsequent to April 22, 2005, had

25  you had any additional Taser training?

```
 2        A       I don't believe so.

 3        Q       Okay.

 4                As part of your Taser training,

 5   was there any discussions as to the advantages

 6   and/or disadvantages of using a Taser on a

 7   subject?

 8        A       Yes.

 9        Q       Can you tell me what the

10   disadvantages would be?

11        A       I don't recall the disadvantages.

12        Q       Let me ask another way.

13                Are there certain persons that you

14   shouldn't use the Taser on?

15        A       Yes.

16        Q       And who would they be?

17        A       Children, infants.

18        Q       Anybody else?

19        A       That's all I recall.

20        Q       And was the use of the Taser on

21   children or infants, was that part of your

22   training, that you shouldn't do that?

23        A       Yes.

24        Q       As part of the training, was there

25   any indication that you should not use the Taser
```

2   on somebody who is intoxicated or otherwise

3   impaired by the use of drugs or alcohol?

4        A    No.

5        Q    Getting back to the two modes, the

6   drive stun mode you actually make physical

7   contact between the Taser and the subject;

8   correct?

9        A    Yes.

10       Q    Now, the cartridge mode, can you

11  describe how that works?

12       A    When you pull the trigger, it

13  deploys two prongs that attach to the subject to

14  deliver the electricity.

15       Q    So when it deploys two prongs,

16  does there have to be full contact between the

17  Taser and the subject or does it shoot like a

18  bullet?

19       A    No, it shoots.

20       Q    And approximately how far can you

21  shoot the prongs?

22       A    Depending on the cartridge,

23  anywhere from 18 to 22 feet.

24       Q    Okay.

25            And as part of your training or

PO E. Sickles

```
 1  your practice of use of a Taser in your career,

 2  after the Taser is used in either mode, is it

 3  suggested or required that the subject be given

 4  medical attention?

 5          A       Not for both.

 6          Q       Okay, for which one?

 7          A       When the prongs are deployed, it's

 8  our procedure to take them to the hospital.

 9          Q       And do you know why?

10          A       To prevent an infection.

11          Q       Does the prong actually enter the

12  body?

13          A       Yes.

14          Q       And does the cartridge mode of the

15  Taser cause the subject to do something

16  different than the drive stun mode?

17          A       When the prongs are deployed,

18  unless turned off by the operator, it will

19  actually initiate a 5-second delivery.  With the

20  drive stun, you can basically take it away any

21  time you want.

22          Q       With the drive stun, you testified

23  before that the purpose is to prevent the

24  subject from acting on his or her own volition.
```

Case 2:09-cv-03177-JFB-ARL  Document 24-8  Filed 06/06/11  Page 39 of 50 PageID #: 178

1                          PO E. Sickles

2    Does the cartridge mode do the same thing or

3    something different?

4           A      No, the same thing.

5           Q      So when or why would you use the

6    drive stun mode versus the cartridge mode?

7           A      Well, the drive stun mode would be

8    used if you felt it was safe to be in close

9    proximity of the subject as opposed to needing

10   some distance between you.

11          Q      And in the course of your career,

12   have you, in practice, used both the drive stun

13   and the cartridge mode?

14          A      Yes.

15          Q      And how many times have you used

16   the drive stun mode?

17          A      Twice.

18          Q      And how about the cartridge mode?

19          A      Once.

20          Q      And the two times you used the

21   drive stun mode, do you recall today when that

22   was?

23          A      For this occasion.

24          Q      Against Mr. Bradway?

25          A      Yes.

PO E. Sickles

```
 1
 2                  MR. TELESCA:  Okay, do you
 3          want to take a break?
 4                  THE WITNESS:  Could I real
 5          quick?
 6                  MR. TELESCA:  Yes.
 7                  (Recess was taken.)
 8                  MR. TELESCA:  Back on the
 9          record.
10     Q      So one time was against
11  Mr. Bradway.  Do you know the other time?
12     A      For the drive stun?
13     Q      Yes.
14     A      Both occasions were for him.
15     Q      Oh, I see.
16            And how about the cartridge mode,
17  do you recall when that was?
18     A      I don't recall what year.
19     Q      Was it more than a year ago?
20     A      Yes.
21     Q      Do you recall the circumstances
22  under which you used the cartridge mode?
23     A      Yes.
24     Q      Can you describe those for me.
25     A      I -- we had actually performed a
```

1    PO E. Sickles

2    vehicle and traffic stop, and the subject was

3    resisting, attempting to pull away from us, and

4    I deployed the Taser.

5         Q      And was that subject taken to the

6    hospital?

7         A      No.

8         Q      What happened?

9         A      The subject fled on foot.  The

10   Taser was ineffective, and the subject fled on

11   foot.

12        Q      Did the -- I believe you called

13   them the prongs, did they actually enter the

14   subject?

15        A      No.

16                    MR. TELESCA:  Okay, I'll

17              mark these as 10 and 11.

18                    (Plaintiff's Exhibit 10,

19              Prescription Drug Abuse Training

20              Seminar Certificate, was marked

21              for identification, as of this

22              date.)

23                    (Plaintiff's Exhibit 11,

24              Domestic Drug Interdiction

25              Certificate, was marked for

Case 2:09-cv-03177-JFB-ARL   Document 24-8   Filed 06/06/11   Page 42 of 50 PageID #: 181

PO E. Sickles

```
2              identification, as of this date.)

3        Q       Okay, Officer Sickles, the two

4  times you used the drive stun mode on the Taser,

5  you testified it was against Mr. Bradway;

6  correct?

7        A       Yes.

8        Q       Do you recall when that was?

9        A       2008.

10       Q       Do you recall the month and day?

11       A       No, I would have to look at my

12 reports.

13       Q       Okay.

14               Let me show you what's been marked

15 Plaintiff's Exhibit 10 (handing).

16               Do you recognize that document?

17       A       (Witness peruses document.)

18               Yes.

19       Q       Can you tell me what it is?

20       A       It's a certificate for a

21 prescription drug abuse training seminar.

22       Q       Was this a required seminar for

23 you to take?

24       A       No.

25       Q       Can you tell me what was entailed
```

1

2    in order to get this certificate?

3          A      I had to go to a -- I believe it

4    was a one-day training course.

5          Q      Do you know where that was?

6          A      Mineola --

7          Q      Okay.

8          A      -- I believe.

9          Q      What was the purpose of getting a

10   prescription drug abuse training certificate?

11         A      Just to be trained in and be aware

12   of how certain subjects will abuse prescription

13   drugs.

14         Q      Okay.

15                You know what, let's take a step

16   back, too, and can you tell me, as part of

17   the -- as a member of the Street Crimes Unit,

18   what is your day-to-day role and responsibility?

19                      MR. TELESCA:   Off the

20                record for a minute.

21                      (Discussion held off the

22                record.)

23                      MR. TELESCA:   Back on the

24                record.

25         A      We do undercover operations,

Case 2:09-cv-03177-JFB-ARL   Document 24-8   Filed 06/06/11   Page 44 of 50 PageID #: 183

PO E. Sickles

 1

 2  narcotics enforcement, we also do State Liquor

 3  Authority stings, prostitution stings, stuff of

 4  that nature.

 5        Q       Do you do investigations

 6  surrounding alleged prescription drug abuse?

 7        A       Yes.

 8        Q       Okay.

 9                And now, do you know whether or

10  not you received this certificate before or

11  after the incident with Mr. Bradway?

12        A       Did I receive this certificate --

13  I mean, it was in my folder.  I don't know if I

14  ever received this myself.

15        Q       Okay.

16                Do you know whether or not you had

17  this training before or after the incident with

18  Mr. Bradway?

19        A       I believe it was after.

20        Q       But you are not sure?

21        A       No, I'm not sure.

22        Q       Okay, let me show you P-11

23  (handing).

24                Do you recognize that?

25        A       (Witness peruses document.)

1                    PO E. Sickles

2              Yes.

3         Q    Can you tell me what P-11 is?

4         A    It's a certificate for domestic

5    drug interdiction.

6         Q    What does that mean, "domestic

7    drug interdiction"?

8         A    It's basically a course teaching

9    you how to interview and different modes of drug

10   investigations.

11        Q    So did the training include how

12   you should deal with or handle a situation when

13   you encounter a person who has used drugs or is

14   overdosing or otherwise intoxicated?

15        A    No.

16        Q    So it has more to do with police

17   investigation work?

18        A    Yes.

19        Q    Is this required, being a member

20   of the Street Crimes Unit?

21        A    No.

22        Q    Okay.

23              Do you have an independent

24   recollection of the arrest of Tony Bradway?

25        A    Yes.

PO E. Sickles

1

2          Q       And can you tell me where he was

3   arrested?

4          A       18 Greenfield Road in Southampton.

5          Q       Now, do you recall that sitting

6   here today, or is that because you reviewed the

7   report yesterday?

8          A       No, I remember it sitting here

9   today.

10         Q       Your recollection is outside the

11  review of your supplementary report?

12         A       Yes.

13         Q       Okay.

14                 And did you go to the Greenfield

15  Road address for the purpose of arresting Tony

16  Bradway or for some other reason?

17         A       Some other reason.

18         Q       Can you tell me what that reason

19  was?

20         A       We were assisting the Detective

21  Division in securing the residence.

22         Q       For what reason?

23         A       I believe the night before they

24  had had an incident there that they were in the

25  process of obtaining a search warrant for.

1                              PO E. Sickles

2          Q      Was a search warrant ever

3    obtained?

4          A      I don't know.  I believe so.

5          Q      Okay.

6                 And who did you go to the location

7    with --

8          A      My partner --

9          Q      -- if anyone?

10         A      -- Vincent Cagno.

11         Q      He's your partner?

12         A      Yes.

13         Q      Is he your partner today?

14         A      Yes.

15         Q      And he was your partner on the

16   date of the incident with Mr. Bradway?

17         A      Yes.

18         Q      So you never saw the search

19   warrant?

20         A      No.

21         Q      Okay.

22                When you arrived at 18 -- it's 18

23   Greenfield Road?

24         A      Yes.

25         Q      Other than Officer Cagno, was

Case 2:09-cv-03177-JFB-ARL   Document 24-8   Filed 06/06/11   Page 48 of 50 PageID #: 187

```
 1                            PO E. Sickles
 2    there any other police officers at the location?
 3            A      Officer Frankenbach.
 4            Q      Okay.
 5                   And do you know why he was there?
 6            A      He was there securing the
 7    residence.
 8            Q      So you were there to assist
 9    Officer Frankenbach?
10            A      Yes.
11            Q      Okay.
12                   And how did you come to encounter
13    Mr. Bradway?
14            A      He was laying on the living room
15    couch.
16            Q      Okay.
17                   Was he by himself on the couch?
18            A      Yes.
19            Q      Other than Mr. Bradway and Officer
20    Frankenbach, and obviously Officer Cagno, was
21    there anybody else in the house?
22            A      Yes.
23            Q      Who was there?
24            A      Danielle Gianini (phonetic
25    spelling).
```

PO E. Sickles

```
 1
 2          Q       Who is she?
 3          A       I believe Mr. Bradway's
 4    girlfriend.
 5          Q       And how did you come to know it
 6    was his girlfriend?
 7          A       They mentioned it after.
 8          Q       Either she did or he did?
 9          A       Yeah.   And I believe Kenny Bow was
10    also there.
11          Q       Was there anybody else in the
12    house?
13          A       I don't recall.
14          Q       Okay.
15                  So other than Ms. Gianini, you
16    don't recall any other females being at the
17    residence at any time you were there on the date
18    he was arrested?
19          A       There was.   There was a female,
20    Tiffany -- I don't recall her last name, was
21    also there with Mr. Bow.
22          Q       Is she somehow related to Mr. Bow
23    or...
24          A       I believe at that time, that was
25    his girlfriend.
```

1 PO E. Sickles

2          Q     Okay.

3                You are not sure about that, you

4   are --

5          A     No, I'm not.

6          Q     Okay.

7                Now, before the date of

8   Mr. Bradway's arrest, had you met any of the

9   people that were in the house, obviously other

10  than the police officers?

11         A     Yes.

12         Q     Who?

13         A     Mr. Bow.

14         Q     How many times had you met him

15  before?

16         A     Several.

17         Q     And you never had met Tiffany

18  before?

19         A     No.

20         Q     How about Ms. Gianini?

21         A     No.

22         Q     How about Mr. Bradway?

23         A     I had met Mr. Bradway before.

24         Q     And where did you meet him?

25         A     I don't recall if I actually met