Exhibit P

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------X
TINA BRADWAY, Individually and as
Administratrix of the Estate of
TONY BRADWAY,

               Plaintiff,


        -against-         Civil Action No.
                        09-CV-3177
                        (JFB)(MLO)

THE TOWN OF SOUTHAMPTON, LINDA A. KABOT,
OFFICER JAMES KIERNAN, OFFICER ERIC SICKLES,
OFFICER VINCENT CAGNO, OFFICER STEVE
FRANKENBACH, OFFICER DAVID PETERS,
OFFICER WILLIAM KIERNAN and OFFICER MONTALBANO,

               Defendants.

-------------------------------------X

               April 13, 2011

               10:34 a.m.

               1425 RXR Plaza

               Uniondale, New York


       DEPOSITION of CHARLES WETLI, M.D., the

Expert Witness herein, testifying on behalf of

the Defendants, taken by the Plaintiff, pursuant

to Federal Rules of Civil Procedure, and Notice,

held at the above-mentioned time and place,

before Lori Anne Curtis, a Notary Public of the

State of New York.

CERTIFIED
TRANSCRIPT

A P P E A R A N C E S:


RUSKIN, MOSCOU & FALTISCHEK, INC.
     Attorneys for Plaintiff
     1425 RXR Plaza
     Uniondale, New York  11556
BY:  THOMAS TELESCA, ESQ.


DEVITT SPELLMAN BARRETT, LLP
     Attorneys for Defendants
     50 Route 111
     Smithtown, New York  11787
BY:  JELTE DEJONG, ESQ.

FEDERAL STIPULATIONS

IT IS HEREBY STIPULATED AND AGREED by and between the parties hereto, through their respective counsel, that the certification, sealing and filing of the within examination will be and the same are hereby waived;

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, will be reserved to the time of the trial;

IT IS FURTHER STIPULATED AND AGREED that the within examination may be signed before any Notary Public with the same force and effect as if signed and sworn to before this Court.

1

2   C H A R L E S      W E T L I,      M. D., the

3          Witness herein, having been first duly

4          sworn by a Notary Public in and of the

5          State of New York, was examined and

6          testified as follows:

7   EXAMINATION BY

8   MR. TELESCA:

9          Q      Would you please state your full

10  name for the record.

11         A      Dr. Charles Wetli.

12         Q      What is your current address?

13         A      2 Berkey -- B-E-R-K-E-Y -- Place,

14  Alpine, New Jersey 07620-3798.

15                    MR. TELESCA:  Good morning,

16               Doctor.  We met before informally.

17               My name is Tom Telesca.  I

18               represent Tina Bradway

19               individually and as the

20               administratrix of the estate of

21               her son, Tony Bradway.

22                    We're here today to take

23               your deposition as an expert

24               witness.  I assume you have been

25               deposed before.

1   C. Wetli, M.D.

2           THE WITNESS:  Correct.

3           MR. TELESCA:  Okay.  So,

4   you understand the process, and

5   what I'll try to do is be clear

6   with my questions, but if there's

7   something that you don't

8   understand, please feel free to

9   ask me to clarify the question, or

10  if there's a term that I'm

11  misusing or is not clear to you,

12  I'd ask that you ask me to

13  rephrase the question.

14          THE WITNESS:  Correct, I

15  understand.

16          MR. TELESCA:  Also, I'd ask

17  that you give me the opportunity

18  to complete my question just as

19  much as I'll give you the

20  opportunity to complete your

21  answer before the next question.

22          THE WITNESS:  Sounds fair.

23          MR. TELESCA:  If at any

24  time you need to take a break, let

25  me know, and we can accommodate

                    C. Wetli, M.D.

          you.

     Q      How did you prepare for today's
deposition, if at all?

     A      I reviewed my file.

     Q      And what is your file?

     A      It consists of a letter I wrote to
Ms. DeJong on the 15th of November 2010, some
typewritten notes I made on October 17, 2010,
and the various materials that were supplied to
me, including covering letters, police reports,
medical records, autopsy and toxicology reports
and a variety of depositions.

                    MR. TELESCA:  Okay, can we
          mark this as W-1.

                    (Exhibit W-1, Opinion
          letter of Dr. Wetli with CV,
          consisting of multiple pages, was
          marked for identification, as of
          this date.)

     Q      Dr. Wetli, I'm going to show you
what's been marked as Exhibit W-1 (handing).
Can you tell me, do you recognize that document?

     A      (Witness peruses document.)
                    Yes, it is the letter -- the

C. Wetli, M.D.

opinion letter I wrote on November 15, 2010 and it's a copy of my CV, current as of the 4th of October 2010.  The last page is my fee schedule, and in between is a list of court testimony from 2006 through mid-2010.

    Q    Okay.

    And on the first page of the November 15, 2010 letter to Ms. DeJong, you list a number of items that were reviewed.  Are these the items that comprise your file?

    A    Everything except an opinion letter by Dr. Blum.  Apparently, I received that after the 15th.

    Q    Okay.

    And then you also mentioned before that you also have some notes in your file?

    A    Yes.

    Q    Can I just take a minute to look through the file?

    A    Sure (handing).

    Q    (Counsel peruses file.)

    Okay, I'd like to just go over some background information, first.  Can you tell me, Dr. Wetli, who your current employer

C. Wetli, M.D.

is.

          A          Basically, I'm self-employed.  I

retired from being the chief medical examiner

and director of forensic sciences for Suffolk

County, New York in August of 2006, and since

then I've been doing only consulting work.

          Q          What kind of consulting work do

you do? .

          A          Anything in the realm of forensic

pathology.  It's predominantly cases like this,

wrongful death, medical practice, criminal, but

basically working -- being retained by attorneys

to give an opinion.

          Q          And you have been doing that since

roughly August, September 2006?

          A          Full time.  Prior to that, I did

it part time as separate from my duties as a

chief medical examiner, but really I started

doing consulting work in 1995, but then in 2006

I was doing it full time.

          Q          And I noticed in your CV up until

1995, it seems as if you were living in Florida.

          A          That is correct.

          Q          And while you were in Florida you

                    C. Wetli, M.D.

weren't doing any of the kind of consulting work

that you are doing now?

        A       Very rarely.

        Q       Does your current consulting

business have a name?

        A       No.  Sole proprietor.

        Q       And if you look at your -- what's

been marked as W-1, which is the November 15,

2010 letter, is it fair for me to refer to that

as your report in this matter?

        A       Sure.

        Q       After your report is your CV?

        A       Correct.

        Q       Does your CV accurately reflect

your educational background?

        A       Yes, it does.

        Q       And you testified earlier this CV

was prepared October 4, 2010?

        A       Correct -- it was updated on

October 4, 2010.

        Q       That was the last update?

        A       No, the last update was I think in

January of this year.

        Q       But at the time you supplied this

C. Wetli, M.D.

1

2    to Ms. DeJong it was before the most recent

3    update.

4        A        Correct.

5        Q        Has anything in your educational

6    background changed in the most recent update?

7        A        No.

8        Q        And the October 2010 CV that we

9    have that's part of W-1, does that accurately

10   reflect the certifications and licenses that you

11   have?

12       A        Correct.

13       Q        Have there been any new ones since

14   October 2010?

15       A        No, there have been no changes as

16   far as certification and licensures.

17       Q        In your CV I notice that you are

18   or were at some point licensed to, I guess,

19   practice medicine in Florida, Missouri, New York

20   and New Jersey.

21       A        Correct.  Right now I have medical

22   licenses in New York and New Jersey.  I allowed

23   the one in Florida and Missouri to expire.

24       Q        Have you ever had a medical

25   license suspended or revoked?

C. Wetli, M.D.

1

2       A       Never.

3       Q       Have you ever been the subject of

4   a disciplinary investigation, action or

5   proceeding?

6       A       Never.

7       Q       During the course of your career

8   as a doctor have you ever been affiliated with

9   any hospitals?

10      A       One.

11      Q       What hospital was that?

12      A       Cedars of Lebanon Hospital, Miami,

13  Florida.

14      Q       Can you tell me the name again?

15      A       Cedars of Lebanon.

16      Q       When did you become affiliated, or

17  when did you get the privileges at that

18  hospital?

19      A       That was in September of 1976.

20      Q       When did that end?

21      A       September of 1977.

22      Q       So it was for one year.

23      A       Correct.

24      Q       And what was the reason why it

25  ended?

C. Wetli, M.D.

1

2      A      Because I did not like private

3  practice and I decided to go into forensic

4  pathology.

5      Q      Okay, so there was never a time

6  you lost your privileges at any hospital for

7  which you were affiliated.

8      A      No, never.  Also, I don't know if

9  you call it a hospital affiliation, but when I

10  was, for three years, in the United States Army,

11  as only the United States Army would do during

12  that time, they had me covering the emergency

13  room at a local hospital.

14      Q      Where was that?

15      A      Japan.

16      Q      So for the three years you were in

17  Japan?

18      A      Yes.  I was mostly working as a

19  pathologist, but they had me on call for

20  emergency room work.

21      Q      Does your October 2010 CV

22  accurately reflect your memberships in

23  professional organizations?

24      A      Yes.

25      Q      Has that been updated since

1                    C. Wetli, M.D.

2      October 2010?

3           A      No, memberships have remained the

4      same since then.

5           Q      I'd like to just go through your

6      employment history.

7                  Is your employment the same thing

8      as what you term "appointments" in your CV?

9           A   .  Basically, yes.

10          Q      Okay.

11                 So you finished medical school in

12     the spring or early summer of 1969?

13          A      Correct.

14          Q      And then you were in the Army at

15     that time?

16          A      No.  After medical school, I did

17     my internship and residency at the University of

18     Miami School of Medicine and worked very briefly

19     for the Dade County Medical Service before going

20     into the United States Army in September of

21     1973.

22                 After that, I did one year of

23     private practice at Cedars of Lebanon Hospital,

24     and then joined the Dade County Medical

25     Examiner's Office full time in September of

                    C. Wetli, M.D.

1977.

        Q       And then at some point you became

the deputy chief medical examiner in Dade

County?

        A       That's correct.  I believe that

was 1980.

        Q       And that was until January of

1995?

        A       Correct.  Also, during my tenure

in Dade County, Florida I was clinical associate

professor of pathology at the Miami School of

Medicine.

        Q       And in February of 1995 you moved

up to either New York or New Jersey -- I guess,

it was New York; is that correct?

        A       Both.

        Q       Okay.

        A       Actually -- it's kind of

complicated.  Actually, I moved to New Jersey,

and worked in Long Island --

        Q       Okay.

        A       -- for all practical purposes;

although, I did have an address in Long Island,

but I did not live there.

C. Wetli, M.D.

Q    Was there any specific reason why you left your position in Dade County to come to work on Long Island for Suffolk County?

A    I had the opportunity to become chief medical examiner in forensic sciences.

Q    Is that a position that you applied for?

A    Yes.

Q    How did you find out about that position?

A    Because the current chief medical examiner, who was a former resident of mine in Dade County, was leaving that position, and I heard it had become open, so I applied.

Q    And then also at or about that time did you also teach at SUNY Stony Brook?

A    Correct.  I was clinical professor of pathology at the State University of New York at Stony Brook.

Q    Dr. Wetli, your October 2010 CV, does it list all the presentations you have given in the last ten years?

A    No, not at all.

Q    So are there some additional ones

1                    C. Wetli, M.D.

2   that were prior to October 2010?

3          A       Oh, yes.

4          Q       Did any of those presentations

5   have subject matter related to a quote/unquote

6   "body packer"?

7          A       Yes.

8          Q       Do you know how many?

9          A       I have no idea.  The only -- if I

10  may clarify, the only presentations listed in my

11  CV are those that have been peer reviewed.

12  Other presentations would be, for example, to

13  police academies, high school students, rotary

14  clubs, et cetera, et cetera, and over the years,

15  these were numerous.

16              But those are all more or less

17  pretty much informal presentations, not formal

18  peer-reviewed presentations, which is what is

19  listed in my CV.

20         Q       And then the ones listed on your

21  CV that were peer reviewed -- can you tell me

22  what does that mean, "peer reviewed"?

23         A       Basically, if you are going to

24  make a presentation at a national meeting, you

25  must first submit an abstract.  This is reviewed

C. Wetli, M.D.

by other forensic pathologists who then make a
decision as to whether or not it is acceptable,
scientifically sound.  And then they further
decide whether it will be a platform
presentation -- that is, an actual talk and
slide show -- versus a poster presentations.

     Q     And is a poster presentation
exactly what it -- a poster literally gets put
up?

     A     Exactly.  You might have, for
example, a poster that covers your entire wall
here (indicating).  It will be in the format of
paper illustrations, summaries, abstracts, and
so forth, discussion.

     Q     I see on Page 8 of the CV,
Number 7, there's a presentation entitled "The
Body Packer Syndrome," and it looks like it was
before the American Academy of Forensic Science
in February 1981.

     A     Correct.

     Q     Do you recall the specific subject
matter of that presentations?

     A     That was it, the body packer
syndrome.

C. Wetli, M.D.

Q       Was there any specific area of the
body packer syndrome that you covered, or was it
a general presentation, if you can recall?

A       Yeah, it was actually -- this was
subsequently published in that same journal as a
peer-reviewed article and it basically described
the body packer syndrome with the toxicology
levels of cocaine and so forth.

Q       So this body packer syndrome
presentation was specifically related to
cocaine, or drugs in general?

A       Well, the only ones we saw in
Miami in those days was cocaine.  Subsequently,
we've seen heroin, too.

Q       And for the record, can you
explain to us what "the body packer syndrome"
is?

A       A "body packer" is basically a
person who swallows packages of drugs, usually
in -- well, in those days, from South America,
usually Columbia.  They would swallow them,
board an airplane headed for Miami, and then
they would go to a hotel room, pass these
condoms or other packets, and retrieve the

                    C. Wetli, M.D.

1  drugs.  However, when they broke open, they

2  killed the person, and that's when the medical

3  examiner got involved, and that was what we were

4  describing in the fatalities.

5          Q       Is there any limit or approximate

6  amount of cocaine that would be carried in the

7  normal body packet?

8          A       In those days, we were generally

9  talking just under a kilogram altogether.

10         Q       How many grams is that?

11         A       A thousand.  Others -- since then,

12 up to one-and-a-half kilos or more have been

13 reported.

14         Q       So one kilogram is a thousand

15 grams, which is how many milligrams, a hundred

16 thousand?

17         A       Yes.

18         Q       And in that presentation, if you

19 can recall, did you present any conclusions in

20 terms of the amount of time it would take from

21 the leaking of the packet, or the breakage of

22 the packet to the time of death?

23         A       That was pretty hard to really

24 come up with.  We would see -- from other things

C. Wetli, M.D.

we knew about cocaine, people swallowing cocaine
and so forth, symptoms would usually begin 20 to
30 minutes after the drug would become absorbed.
Sometimes, if the packet completely broke open,
then within a half hour the person is having
seizures and is dead.  If it was a very slow
leak, then symptoms can actually go on for some
period of time before they would actually die.

     Q     And what would be some of the
first symptoms that you would see in the case of
a slow leak?

     A     You would see a person who could
become very agitated, they could become
psychotic, high body temperatures.  Those would
be some of the symptoms.  Sometimes they became
incredibly constipated and they were saddled
with distended abdomens, because of swollen
intestines.  There could be a variety of things
that happen to them.

     Q     And does your CV also list all
governmental testimony and symposia that you
have presented in the last ten years?

     A     Yes.

     Q     Now, would those also be peer

                    C. Wetli, M.D.

reviewed?

    A        No, they would be invited.  For

example, the President's Commission on Organized

Crime, governor's councils, certain Grand Jury

presentations.  These are organizations,

governmental organizations, that are requesting

knowledge of a particular topic, such as cocaine

toxicity, Quaaludes, that type of thing, which I

participated in.

    Q        On Page 12 of your CV under

Number 11, you gave -- I don't know if it was

testimony or a presentation to the National

Institute on Drug Abuse in Bethesda, Maryland on

July 9th through 10, 1991 entitled "Acute

Cocaine Intoxication:  Current Methods of

Treatment."

            Do you see that?

    A        Yes.

    Q        Was that testimony or some sort of

presentation?  How would you describe that?

    A        That was mostly a presentation to

the National Institute of Drug Abuse, and it was

subsequently published under monograph.  It's

listed NIH Publication 93-3498.

1                    C. Wetli, M.D.

2          Q        And when you say "acute cocaine

3    intoxication," what does that mean, "acute"?

4          A        Basically a surge of cocaine in

5    the blood, and it can cause a variety of things

6    to happen to a person.  It can cause seizures

7    and sudden death; it can cause psychotic

8    reactions, which can lead to sudden death; it

9    can cause vascular problems, such as

10   hypertensive crisis, aortic dissections and

11   ruptured aneurysms, which can lead to immediate

12   death; and it can also lead to heart attack,

13   which can also kill you quickly.

14         Q        And the presentation, obviously,

15   according to its title, involved, at that time,

16   current methods of treatment?

17         A        Correct.

18         Q        And at that time, what were, if

19   any, the methods of treatment for acute cocaine

20   intoxication?

21         A        Basically the same as they are

22   today; treat the symptoms, whatever they may be.

23         Q        What does that mean, "treat the

24   symptoms"?

25         A        Well, if a person comes in with

1                    C. Wetli, M.D.

2    110 fever, you try to cool them down; if they

3    are psychotic, you try to tranquilize them.

4    There are certain drugs you can or cannot use if

5    it's cocaine toxicity.

6              If a person is having seizures,

7    you would administer intravenous diazepam and/or

8    dilantin or other drugs to calm down the seizure

9    activity and so forth.  That's all you can do.

10         Q    So there's no antidote for

11    cocaine?

12         A    No, unlike narcotics, there is no

13    antidote for cocaine.

14         Q    If someone presents in the

15    emergency room who has ingested a certain amount

16    of cocaine, is there anything that you can do to

17    rid the body of the cocaine?

18         A    Not effectively.  If it's a body

19    packer, it requires surgery, generally.  If they

20    are showing signs of cocaine toxicity, you must

21    operate immediately, because there's obviously a

22    package that's broken open or leaking.  The only

23    chance of survival is to remove all the cocaine

24    from the entire gastrointestinal tract.

25              If there are no symptoms, you can

C. Wetli, M.D.

simply give them laxatives and follow up by

X-ray as they excrete them, but once they start

having symptoms, then you would have to get rid

of the cocaine.

I don't know if activated charcoal

is effective with cocaine or not, otherwise you

would have to get it out of the stomach or

wherever the cocaine happened to be.

If it's a mini-packer and they

simply swallowed cocaine without the package,

then gastric lavage would be the only way to get

it out.

Q     And what is that, a "gastric

lavage"?

A     Washing the stomach.  Basically,

you put down a tube through the nose into the

stomach and flush with saline and draw out as

much as you can.

Q     So then there are -- I'm just

trying to understand and condense what you said.

You can surgically remove a packet?

A     If you can identify the packet, if

you can see the packet, yes, but otherwise, you

are going to be doing exploratory laparotomy and

1                    C. Wetli, M.D.

2      going through the entire bowel to see if you can

3      find a packet.

4           Q      And "laparotomy" is an operation

5      of the stomach?

6           A      Well, opening up the abdomen and

7      inspecting everything that's in there.

8           Q      Okay.

9           A      But if there's no packet, then

10     there's not much you can do.

11          Q      Well, if you can't find the packet

12     but the cocaine is in the stomach, you can try

13     to flush it out through some sort of tube?

14          A      You could try, yes.  I've never

15     seen that successfully done, but you can try.

16          Q      Have you ever treated a person who

17     has ingested cocaine in an emergency room

18     situation?

19          A      I'm not a treating physician.

20          Q      In your October 2010 CV does it

21     list all of your publications in the last ten

22     years?

23          A      Yes, yes.

24          Q      Have there been any since

25     October 2010?

                    C. Wetli, M.D.

    A       No, there have not.

    Q       Do you know, as you sit here
today, what portion of your CV has been updated
since October 2010?

    A       Only some activities with the
National Association of Medical Examiners.

    Q       Did any of those activities have
to do with the body packers?

    A       No.

    Q       If you look at Page 14 of your CV,
Number 15, there is a publication entitled "The
Body Packer Syndrome:  Toxicity Following
Ingestion of Illicit Drugs Packaged For
Transportation," and that's in the Journal of
Forensic Science in 1981.

    A       Correct.  That was the formal
article following the presentation that was
given at the academy.

    Q       Okay.

            And so the topic of the article
and the topic of the presentation were the same?

    A       Exactly.  The platform
presentation was a preview for the article.

    Q       And then Number 17 on that same

1          C. Wetli, M.D.

2 page, also from 1981, is a publication entitled

3 "Cocaine Intoxication:  Delirium and Death in a

4 Body Packer."

5          Can you tell me what the subject

6 matter on that article was?

7          A          Sure.  That was a case report

8 based on an individual who was a body packer, a

9 cocaine body packer, from Columbia, South

10 America, and he had passed all of the packets of

11 cocaine except for one which became, shall we

12 say, stuck in the right side of his colon, and

13 lingered there, as I recall, for approximately a

14 week and deteriorated, and the cocaine release

15 caused him to become psychotic, violent and die

16 suddenly.

17          It's a syndrome which my coauthor,

18 Dr. Fishbein, identified as "excited delirium"

19 due to cocaine.

20          Q          Was that a new term of art at that

21 time, excited delirium?

22          A          It was the first I had heard it.

23 He's the one who introduced me to the term.

24          Q          Is he the one that coined the

25 term?

1          C. Wetli, M.D.

2     A     No.

3     Q     Now, earlier you testified that

4  the body packers could be carrying as much as

5  one kilogram of cocaine.

6     A     Correct.

7     Q     Now, would that be in one or more

8  than one package, or it depended?

9     A     Oh, not one package, no. Numerous

10  packages, a hundred, hundred-thirty.

11     Q     And how big would these separate

12  packages be?

13     A     Each package would hold about 10

14  to 15 grams of cocaine.

15     Q     And how big would that package be

16  in terms of size, if you could tell me?

17     A     Oh, generally, they are about an

18  inch long and a half-inch diameter,

19  approximately.  Very large pills to swallow.

20     Q     Now, the publications that you

21  have listed in your CV, were they all peer

22  reviewed?

23     A     Yes.

24     Q     Did you receive any comments on

25  the two that we discussed related to body

                      C. Wetli, M.D.

packing?

     A     I don't believe so.  That was a
long time ago.  I don't recall.  I don't believe
so.

     Q     Now, since the two publications in
1981, have you done any further formal research
on the topic of body packing?

     A     Sure.

     Q     And when was the most recent time
you performed research on body packing?

     A     That would have been probably
around late 1990s when we published an article
on heroin body packing.

     Let me see if I can find it for
you quickly.

     (Witness perusing document.)

     Here it is, Reference Number 88,
1997.

     Q     Are there significant distinctions
between heroin body packing and cocaine body
packing in terms of what kind of treatment can
be administered if there's a leak?

     A     Oh, yes.

     Q     What is the distinction?

C. Wetli, M.D.

A    Well, heroin is a narcotic, and therefore would be amenable to treatment with Narcan -- N-A-R-C-A-N -- which is a direct antagonist.  So if you would inject Narcan into a person having an opiate overdose, it will counteract it.  It's basically an antidote, which would be life-saving.  But heroin body packers never make it to the emergency room.

Q    Why is that?

A    Because the heroin is too valuable.  They allow the person to die, then they cut them open and remove the heroin themselves.  That's one of the big differences between heroin and cocaine body packing.

Q    I'd like now to turn to the cases that you have listed at the end of your CV --

A    For the record, that's not part of my CV.  It's a separate document, but I don't consider that as part of my CV.

Q    Sure.

Okay, so it begins after the last page of your CV that is Page 32.

A    Right.

Q    Okay.

C. Wetli, M.D.

1

2          Now, does your -- I'll call it

3     your case list; is that fair?

4          A     Well, it's a list of testimony,

5     anyway.

6          Q     Okay.

7               Your list of testimony, does it

8     include all cases where you testified at trial

9     or by deposition in the last four years?

10         A      If I was put under oath, it's

11    listed; court marshals, inquests, whatever.

12         Q     Okay.

13              Do any of the cases in the last

14    four years -- are they specifically related to a

15    body packer?

16         A     I don't recall body packer.  What

17    we call mini-packer people -- a body packer is

18    somebody smuggling the drug in from another

19    country -- were other cases I've had.  I don't

20    recall if I actually testified or not.  They are

21    people who are being arrested by police and

22    swallow the cocaine to avoid the detection of

23    the drug, and they subsequently die due to the

24    toxicity.  I've had a number of those cases.  As

25    to whether I've testified or not, I don't

1                    C. Wetli, M.D.

2    recall.

3         Q       Okay, I want to make sure I

4    understand the distinction between a body packer

5    and a mini-packer.

6                With a mini-packer, does that mean

7    that the cocaine that was ingested was contained

8    within a bag?

9         A    .  Could be.

10        Q       But it's not necessary?

11        A       Correct.

12        Q       Okay.

13                So there are cases where you used

14   the phrase "mini-packer" where a person may have

15   just ingested cocaine itself?

16        A       Correct.  It could be in the form

17   of a powder or it could be crack cocaine or it

18   could be cocaine in packets that were -- where

19   the person had an intent to sell the packets or

20   purchased the packets, either one, but they had

21   the packets of cocaine, and so in order to avoid

22   police detection they swallowed the packets of

23   whatever they had.

24        Q       In your review of the records in

25   this case, did Mr. Bradway swallow the cocaine

C. Wetli, M.D.

itself or within a package?

         A        As far as we can tell, he probably
did both.  As I recall -- as I understand the
sequence of events, when he was at the point --
when the police were at the scene, at the home,
he spit out a package as well as separately a
white substance.  After he died and the autopsy
was done, they looked for a packet, the remnants
of a packet, and couldn't find one.

         Q        What does that signify to you?

         A        That unless he had a bowel
movement at some time after he was in the
hospital, that he swallowed -- it's hard to
reconcile.  He would have to -- most likely, I
think the packet was missed.  It was just not
found, because it's a very -- when you have a
lot of cocaine present, as he did, it kills very
quickly, and so I'd be surprised that there is
no cocaine packet.

         Q        So it is your testimony that you
think one possibility is that the medical
examiner missed the packet?

         A        Or whoever is looking through the
intestinal contents, yes, or that he passed it

C. Wetli, M.D.

somewhere in the hospital. He was in the
hospital, I think, altogether for about seven
hours or something, so I don't know.

Q     In the list of testimony that's
part of Exhibit W-1, are there any cases in
which you gave testimony involving an allegation
that there was a failure to get medical
attention related to a cocaine overdose?

A     I don't recall that I testified to
that. I know I've had cases where that
allegation was made, but whether I testified
subsequently at trial, I don't recall.

Q     Do you recall the most recent case
where that allegation was made?

A     No.

Q     Do you recall in the last four
years how many cases you have been involved with
in which the allegation of -- there was an
allegation that there was a failure to obtain
medical attention after someone ingested
cocaine?

A     I couldn't tell you. I don't keep
records of that.

Q     Okay.

C. Wetli, M.D.

1

2          Do you recall any of the

3   conclusions that you reached in cases in which

4   you have been involved where there was an

5   allegation that a party failed to get someone

6   medical attention after they ingested cocaine?

7               THE WITNESS:  I'm sorry,

8               could you repeat the question.

9               (The requested portion of

10              the record was read by the court

11              reporter.)

12       A       Generally the conclusions I

13  reached is that had they gotten them medical

14  attention, the outcome would not have changed

15  because there is no antidote for cocaine.  Once

16  the symptoms begin, you can't treat them,

17  especially a true overdose.

18       Q       How would you define an

19  "overdose"?

20       A       An overdose of cocaine is

21  generally marked by the presence of grand-mal

22  seizures, and if it's a nonfatal overdose, the

23  seizures are very limited and transient and over

24  with by the time the person gets to the

25  emergency room.  If it's a fatal overdose, the

1          C. Wetli, M.D.

2   seizure is usually the terminal event.  They die

3   in the police station.

4          Q       So if someone ingested some amount

5   of cocaine, you testified earlier, that it is

6   possible -- although there's no antidote for the

7   cocaine, there is potential treatment in that

8   you can try to remove the cocaine from the

9   stomach, for example?

10          A       If you can see a drug packet

11  there, otherwise you would have to presumably

12  try and lavage the drug out of the stomach.  I

13  guess you could theoretically go in, operate and

14  empty the stomach that way.  Of course, I've

15  never heard of that being done.

16          Q       And you are not familiar or aware

17  of the success of using charcoal?

18          A       I have no idea of charcoal ever

19  working.

20          Q       And exactly how would the

21  charcoal -- it would be administered by the

22  mouth?

23          A       I'm not really sure.  I think it's

24  generally administered by a nasogastric tube,

25  basically injected into the nasogastric tube so

                    C. Wetli, M.D.

it goes through the gastrointestinal tract and

finds drugs.  With a very highly water-soluble

drug like cocaine, I don't know if it would be

effective.  I just don't know.  You would have

to ask a clinician that.

        Q       Do you recall when you were

retained by Ms. DeJong's firm for this matter?

        A       I believe it was late summer or

early fall of 2010.

        Q       And by whom were you retained?

        A       By Ms. DeJong.

        Q       By her firm?

        A       Correct.  September 17th is when I

received the initial materials -- well, the

covering letter is dated September 17, 2010.

        Q       And before that date, you had some

conversations with Ms. DeJong?

        A       Right, actually in August of 2010.

        Q       So it was at or about August of

2010 that you were retained?

        A       Basically it was inquirous to

whether I would be willing to be retained in

August, and then I was retained in September.

        Q       I understand.

1                       C. Wetli, M.D.

2                       And you are being compensated in

3    accordance with the fee schedule that's the last

4    page of W-1?

5           A       Correct.

6           Q       And what was it that -- let me

7    take a step back.

8                       Other than Ms. DeJong, did you

9    speak with anybody else from her firm with

10   regard to --

11          A       No, not that I recall.

12          Q       So your primary contact concerning

13   this matter has been with Ms. DeJong?

14          A       Correct.

15          Q       And what did she ask you to do?

16          A       Determine the cause of death and

17   to see if the hour-and-a-half delay from the

18   time he was arrested to the time he got to the

19   hospital had any significant impact or affected

20   the outcome of Mr. Bradway.

21          Q       What conclusion did you reach?

22          A       No, it did not.

23          Q       Other than the items that are

24   listed at the very beginning of your report, did

25   you review any other data, information or

1                    C. Wetli, M.D.

2     documents?

3          A          No.    As I said, the only thing I

4     reviewed that's not listed in my report is the

5     report of Dr. Blum, B-L-U-M.

6          Q          And the information that you

7     reviewed you received from Ms. DeJong; correct?

8          A          Correct.

9          Q          In forming your conclusion, did

10    you review any literature?

11         A          No.

12         Q          Can you tell me, then, your

13    conclusion is that the period of time between

14    Mr. Bradway's arrest and the time at which he

15    reached the hospital, that, I'll call it,

16    "delay" didn't have any impact on the ability of

17    his life to be saved?

18         A          Correct.

19         Q          Okay.

20                     And what do you base that

21    conclusion on?

22         A          Basically the toxicology.  He's

23    got phenomenally high levels of cocaine in his

24    system.  He's got -- people who die with a

25    psychotic reaction to cocaine generally have

C. Wetli, M.D.

about .8 milligrams per liter of cocaine in the

blood.  People who die with seizures from a true

overdose of cocaine, the average is about

5 milligrams per liter.  He's got 6.5.

He's got incredibly high levels in

the brain.  He's still has 2 grams remaining in

his stomach.  He's got very high levels of

cocaine metabolite in his blood and about half

that in the brain.  He's also been in the

hospital for a number of hours, so he's got

incredibly high levels.  He's been absorbing a

lot of cocaine.

Q      Can you determine at what point --

or did you determine at what point Mr. Bradway

ingested the cocaine?

A      All we know is what the police

report said.  They saw him chewing on something

and they applied the Taser twice, forcing him to

spit out what they thought was all that he had

ingested, and he would have had to have ingested

it all that the point.

Q      Okay.

So, I just want to make sure I

understand you correctly.  Is it your testimony

1           C. Wetli, M.D.

2   that Mr. Bradway ingested all of the cocaine at

3   one time?

4                   MS. DEJONG:  I'm objecting.

5                   I don't believe he testified to

6                   that.  You are having him guess at

7                   this point.

8           A       Right.  All I can do is rely on

9   the police reports.  They said they saw him

10  ingest it -- chewing something.  They told him

11  to spit it out.  They Tasered him twice.  To my

12  knowledge, they never saw him ingest anything

13  else after that incident.  So if that's true,

14  then he would have had to have ingested it all

15  at one time.

16          Q       So looking at your report, and

17  just -- I guess in understanding the timeline, I

18  think you would agree that he was arrested, at

19  least according to the report, at 10:25 a.m. on

20  the morning of June 8th.

21          A       Correct.

22          Q       And that the police observed him

23  ingesting some amount of cocaine.

24          A       Correct.

25          Q       And nobody is disputing that he

1          C. Wetli, M.D.

2  ingested some amount of cocaine.

3          A       Correct.

4          Q       Now, in your report -- and I'm

5  looking at the last paragraph on the second

6  page, and I'm just going to read it into the

7  record, the first couple of sentences.

8          It says:  "In the case of

9  Mr. Bradway, it was obvious that he had ingested

10  some cocaine at the time of his arrest.

11  However, if it were a lethal ingestion of

12  cocaine at that time he would have had the

13  sudden onset of seizures within a half an hour

14  after ingestion."

15          So I guess I just want to be clear

16  that we don't know at the time of his arrest

17  whether he ingested the cocaine within or

18  without some other kind of packet or package?

19          A       Let me explain to you, if I can

20  clarify.

21          Q       Sure.

22          A       People who are mini-packers, when

23  they don't have a package of cocaine, they just

24  have the powder, and they are about to be

25  arrested by the police and they swallow that

C. Wetli, M.D.

powder to avoid detection, the usual story is they are arrested, taken to the police station, and about a half-hour after they are -- after that first encounter, about a half-hour or so, they suddenly go into seizures which are fatal. So it's about a half hour after the ingestion.

The only thing that makes sense here is he ingested some cocaine at that time, but he had to have ingested a packet of cocaine which later on broke and which was not discovered at the autopsy, because we know to get these lethal levels, these very high levels of cocaine and they induce seizures, it's generally about a half-hour after the drug has actually been ingested.

That's the only thing that makes any sense. Had he ingested all the cocaine at that time, and had it been absorbed within a half hour, he would have died in the police station. He would not have made it to the hospital.

Q       Are there any factors which may delay the effect of cocaine?

A       Not that I know of.

C. Wetli, M.D.

Q       So your genetics or your ability
to metabolize or your own tolerance for the
drug --

A       Not when it comes to overdoses
such as we see here.  There are some genetic
differences in the way males and females handle
cocaine, but generally in relationship to the
excited delirium, not to the overdose.

Q       So the 30-minute time period
between -- is it ingestion and the seizure, is
that 30 minutes the maximum amount of time?

A       All I can say is it's
approximately 30 minutes, because nobody is
sitting there with a stopwatch, and ingestion,
as I said, could be swallowed, sometimes it's
due to vaginal installation of cocaine, same
thing happens, about a half hour.

Q       Is there a distinction between
"ingestion" and "absorption"?

A       Yes.

Q       What is that distinction?

A       Well, "ingestion" -- I can swallow
the packet of cocaine, so I'm ingesting it, but
it's not being absorbed until that packet

1          C. Wetli, M.D.

2   breaks.   Then, it's being absorbed.

3          Q     If you swallow a certain amount of

4   cocaine outside of a packet, just the actual

5   drug, how long does it take to begin to absorb

6   into the stomach?

7          A     Like all water-soluble drugs, they

8   will start to be absorbed in 20 minutes.   But

9   cocaine, you can get variations in there because

10  cocaine also constricts blood vessels.   Very

11  high concentrations can also dilate blood

12  vessels and cause bleeding, so there's some

13  variation there, but generally, it's about

14  20 minutes, like most water-soluble drugs.

15         Q     And then it's 20 to 30 minutes

16  from the time of absorption, if it's a lethal

17  amount of cocaine, before you have the first

18  seizure?

19         A     From the time of ingestion.

20         Q     Okay, that's what I'm trying to

21  make sure of.

22         A     Right.   No, it's the time of

23  ingestion.

24         Q     So it would be approximately ten

25  minutes, plus or -- obviously, like you said,

C. Wetli, M.D.

1
2  there's no stopwatch, but approximately ten

3  minutes after the drug begins to absorb before

4  the seizures would begin?

5       A       Well, the drug is going to start

6  getting absorbed right away, but it might be

7  about 20 minutes before we can see detectable

8  levels.  When they take volunteers, for example,

9  give them cocaine, they draw the blood at

10  various time intervals.  It's usually about

11  20 minutes before the blood levels start to rise

12  rapidly.

13            And again -- and these data on

14  time of absorption and so forth are based on

15  volunteers who are given a limited amount of

16  cocaine under a controlled laboratory

17  environment.  What I'm talking about are people

18  who are known to have ingested the cocaine, and

19  no blood levels are taken, but then they

20  suddenly have a seizure and die.  It's much more

21  rapid, probably because they are taking a lot

22  more cocaine.

23            Q       Right.

24                    Are there any factors that can

25  slow the rate of absorption?

1                    C. Wetli, M.D.

2        A        Not that I'm aware of, no.

3        Q        And is it true, though, that the

4   rate of absorption in the stomach would be

5   slower than, for example, if you put the cocaine

6   in your nose or your mouth?

7        A        No, it's pretty much the same.

8   Again, you are going to be getting less cocaine

9   in the nose or the mouth, because, first of all,

10  using less cocaine and secondly, you are getting

11  the vasoconstriction of the blood vessels.  That

12  doesn't necessarily happen in the stomach.

13       Q        In the documents that you

14  reviewed, is it your understanding that

15  Mr. Bradway was Tasered by the police?

16       A        Yeah, in drive-stun mode, that's

17  correct.

18       Q        Now, would the Taser have any

19  impact on the absorption rate of the cocaine

20  into Mr. Bradway's system?

21       A        Not at all.

22       Q        And you reviewed the hospital

23  records; correct?

24       A        Correct.

25                    MR. TELESCA:  Would you

1                    C. Wetli, M.D.

2              mark this W-2, please.

3                    (Exhibit W-2, Hospital

4              records for Mr. Bradway, was

5              marked for identification, as of

6              this date.)

7        Q      Dr. Wetli, I am going to show you

8   what's been marked Exhibit 2.  Do you recognize

9   those records (handing)?

10       A      (Witness peruses document.)

11              These appear to be the hospital

12  records I reviewed concerning Mr. Bradway.

13       Q      Now, it's your opinion that

14  Mr. Bradway, at the time of his arrest, must

15  have swallowed a packet of cocaine that was

16  intact; correct?

17       A      Correct.

18       Q      And that at some point after his

19  arrest, the package ruptured.

20       A      Correct.

21       Q      Okay.

22              And in your report on Page 3, in

23  the last paragraph you wrote:  "The packet began

24  to leak and finally ruptured after he" --

25  Mr. Bradway -- "had already arrived at the

1                    C. Wetli, M.D.

2    hospital."

3         A       Correct.

4         Q       What do you base that conclusion

5    on?

6         A       Because had he had it rupture at

7    the time that he was arrested, then he would

8    have died at the police station.  He would not

9    have made it to the hospital.

10        Q       But it could have ruptured

11   sometime between the time of his arrest and the

12   time he arrived in the emergency room.

13        A       It's possible it could have

14   started leaking at that particular point, but it

15   wouldn't have been a bursting with a sudden

16   release of 5 grams of cocaine into him at that

17   point.

18        Q       So it's your conclusion that the

19   packet didn't leak, it actually ruptured, or you

20   don't know?

21        A       There's no way to know for sure.

22        Q       Okay.

23                So there's no way for you to know

24   whether or not the package first started to leak

25   and combined with the cocaine that Mr. Bradway

1                    C. Wetli, M.D.

2    ingested outside of the packet?

3          A       Correct.

4          Q       And if you look at -- I tried to

5    make this easier for us, the first flagged

6    page --

7          A       Correct.

8          Q       -- which should be -- on the top

9    it's "Report of Consultation by" the consultant

10   is Rajesh -- R-A-J-E-S-H -- Patel, M.D.

11         A       Right.

12         Q       And if you look at that report,

13   about midway down the history, it says:  "Upon

14   arrival to the emergency room, he" --

15   Mr. Bradway -- "was extremely agitated and

16   Ativan 2 milligrams IN was given."  Do you see

17   that?

18         A       Correct.

19         Q       So the fact that Mr. Bradway upon

20   arrival to the emergency room was extremely

21   agitated, what does that signify to you?

22         A       He's having some cocaine toxicity.

23         Q       Okay.

24                 Now, do we know whether that's

25   related to the package leaking or being ruptured

                    C. Wetli, M.D.

or whether it may have been the cocaine that he

ingested outside of the package?

         A       It could have been a combination

of both.  Shortly after that, about 15 minutes

later, he starts having seizures.  So it

indicates it would be more likely that the

package is beginning to rupture.

         Q       Okay.

                 And based on your review of the

medical records, can you determine that

15 minutes, what that time period is measured

from?

                    MS. DEJONG:  Do you

                    understand the question?

                    THE WITNESS:  Yes.

         A       From the time they gave him the

Ativan, apparently.  That's the way I interpret

the record, anyway.

         Q       Now, if you look at -- I believe

it's the third tab --

         A       (Witness complies.)

         Q       -- which is the emergency room

nursing record; is that correct?

         A       Yes.

                    C. Wetli, M.D.

                    MR. TELESCA:  It looks like

          this page here (indicating).

                    MS. DEJONG:  Yes, I have

          it.

     Q        So at the very top, it says that

he arrived at 12:04 --

     A        Correct.

     Q        -- to the emergency room.  And in

the right column under "General Appearance," it

records severe distress and that Mr. Bradway was

agitated; correct?

     A        Correct.

     Q        So again, what does that signify

to you?

     A        Well, in context of this case,

that he's having cocaine toxicity.

     Q        And if you look at the next page,

it lists medications on the left-hand side, and

the first time that the Ativan appears to be

administered was at 12:50; correct?

     A        Correct.

     Q        So then it would be -- according

to the record of Dr. Patel, the first seizure

occurred 15 minutes after the first

1                    C. Wetli, M.D.

2     administration of the Ativan?

3          A      Correct.

4          Q      So that would have been about

5     1:05 p.m.?

6          A      Correct.

7          Q      Earlier in your testimony you

8     stated that in a case where the hospital can

9     determine that there actually is a packet in the

10    stomach, it could be removed?

11         A      If they could find it, yes.

12         Q      And how would they find it?

13         A      You would -- well, by X-ray, you

14    would have to get a leakage of fluid into the

15    package itself and then you would see what's --

16    it's called a double condom sign, you get air

17    and fluid in there which would outline the

18    packets; you could see it that way.  Otherwise,

19    you might not be able to see it.

20                With today's technology of MRIs

21    and CTs, I don't know if they would pick it up

22    or not.

23         Q      So when you say you could see it,

24    how would you be able to see it?

25         A      On X-ray, an outline of the

1                    C. Wetli, M.D.

2    packet.  You don't see all of the packets, but

3    you see some of them.

4         Q       In Mr. Bradway's case, do you know

5    whether or not the packet he swallowed could

6    have been seen with an X-ray?

7         A       I have no idea.

8         Q       We don't know what kind of packet

9    it was; correct?

10        A       Exactly.  And as far as I know,

11   they did not take any abdominal X-rays; they

12   just took chest X-rays.

13                    MR. TELESCA:  I have no

14                    further questions.

15                    (Time noted:  11:42 a.m.)

16

17

18

19

20

21

22

23

24

25

1

2                    A C K N O W L E D G M E N T

3

4    STATE OF NEW YORK    )

5                              :ss

6    COUNTY OF                 )

7

8         I, CHARLES WETLI, M.D., hereby certify

9    that I have read the transcript of my testimony

10   taken under oath in my deposition of April 13,

11   2011; that the transcript is a true and complete

12   record of my testimony, and that the answers on

13   the record as given by me are true and correct.

14

15                    _____

16                    CHARLES WETLI, M.D.

17

18   Signed and subscribed to before me this

19   _____ day of _____, 2011.

20

21   _____

22   Notary Public, State of New York

23

24

25

INDEX TO TESTIMONY

| WITNESS | EXAMINATION BY | PAGE |
|---------|----------------|------|
| Charles Wetli, M.D. | Mr. Telesca | 4 |

INDEX TO EXHIBITS

| EXHIBITS | DESCRIPTION | PAGE |
|----------|-------------|------|
| W-1 | Opinion letter of Dr. Wetli with C.V. | 6 |
| W-2 | Hospital records for Mr. Bradway | 48 |

ERRATA SHEET FOR THE TRANSCRIPT OF:
Case Name: Bradway v. Town of Southampton, et al
Deposition Date:  April 13, 2011
Deponent:  Charles Wetli, M.D.
Place:  1425 RXR Plaza, Uniondale, New York

                    CORRECTIONS

PG    LN    NOW READS        SHOULD READ    REASON FOR
--    --    _____       _____     _____

--    --    _____       _____     _____

--    --    _____       _____     _____

--    --    _____       _____     _____

--    --    _____       _____     _____

--    --    _____       _____     _____

--    --    _____       _____     _____

--    --    _____       _____     _____

--    --    _____       _____     _____

--    --    _____       _____     _____

--    --    _____       _____     _____

--    --    _____       _____     _____

--    --    _____       _____     _____

_____                _____
Date                  Signature

Subscribed and sworn to before me
this        day of            2011.

_____
      (NOTARY PUBLIC)

1

2                    C E R T I F I C A T E

3

4          I, LORI ANNE CURTIS, a Notary Public in

5     and for the State of New York, do hereby

6     certify:

7          THAT the witness(es) whose testimony is

8     hereinbefore set forth, was duly sworn by me;

9     and

10          THAT the within transcript is a true

11     record of the testimony given by said

12     witness(es).

13          I further certify that I am not related,

14     either by blood or marriage, to any of the

15     parties in this action; and

16          THAT I am in no way interested in the

17     outcome of this matter.

18          IN WITNESS WHEREOF, I have hereunto set

19     my hand this 23rd day of April, 2011.

20

21

22     _____
                    LORI ANNE CURTIS

23

24

25