UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————

№ 09-cv-3177(JFB) (ARL)

———————————

TINA BRADWAY, Individually and as
Administratrix of the Estate of
TONY BRADWAY

Plaintiff,

VERSUS

TOWN OF SOUTHAMPTON, ET AL.,

Defendants.

———————————

**MEMORANDUM AND ORDER**
December 1, 2011

———————————

JOSEPH F. BIANCO, District Judge:

Tina Bradway, individually and as administratrix of the estate of Tony Bradway ("Bradway") brought this action against the Town of Southampton, Linda A. Kabot, Officer James Kiernan, Officer Eric Sickles, Officer Vincent Cagno, Officer Steve Frankenbach, Officer David Peters, Officer William Kiernan, and Officer Montalbano, alleging violations of Bradway's constitutional rights pursuant to 42 U.S.C. § 1983, conspiracy, assault, battery, intentional infliction of severe emotional distress, malicious abuse of process, negligence, and wrongful death. Plaintiff has withdrawn all claims except the claims against the remaining individual defendants for the alleged violation of Bradway's constitutional right under the Fourteenth Amendment, as well as the state claims against the Town of Southampton for negligence and wrongful death.[1]

---

[1] By stipulation filed May 20, 2011, plaintiff voluntarily dismissed the following claims: (1) violation of constitutional rights under the Fourth Amendment due to the use of excessive force; (2) violation of constitutional rights under the New York State Constitution generally; (3) violation of the Equal Protection Clause of the Fourteenth Amendment; (4) conspiracy; (5) assault; (6) battery; (7) intentional infliction of emotional distress; (8) malicious abuse of process. Stip. of Vol. Dis., May 20, 2011, ECF No. 23. In plaintiff's opposition brief to the instant motion, plaintiff agreed that the following claims cannot be supported by the record (and confirmed at oral argument that they are withdrawn): (1) unlawful search and seizure in violation of the Fourth Amendment; (2) violations of the Fifth Amendment; (3) negligent supervision, training or hiring; and (4) claims

Specifically, plaintiff alleges that the individual defendants violated Bradway's constitutional rights under the Fourteenth Amendment due to their deliberate indifference to a serious medical need – namely, Bradway's need for medical attention after swallowing a large quantity of cocaine at the time of his arrest on June 9, 2008 – which resulted in Bradway's death. Plaintiff also asserts the claims of negligence and wrongful death only against the Town of Southampton based upon the alleged conduct of the individual police officers.[2]

The remaining defendants now move for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, on all remaining claims. For the reasons set forth below, the Court denies defendants' motion for summary judgment.

I. BACKGROUND

A. Procedural Background

Plaintiff filed the complaint in this action on July 23, 2009. Defendants answered the complaint on August 7, 2009. On June 6, 2011, defendants moved for summary judgment. Plaintiff submitted her opposition on July 6, 2011. Defendants submitted their reply on August 2, 2011. The Court held oral argument on November 3, 2011. The Court has fully considered the submissions of the parties.

B. Factual Background

The Court has taken the facts set forth below from the parties' depositions, affidavits, and exhibits, and from the parties' respective Rule 56.1 statements of facts. Upon consideration of a motion for summary judgment, the Court shall construe the facts in the light most favorable to the non-moving party. *See Capobianco v. City of New York*, 422 F.3d 47, 50 (2d Cir. 2005). Unless otherwise noted, where a party's 56.1 statement is cited, that fact is undisputed or the opposing party has pointed to no evidence in the record to contradict it.[3]

On June 9, 2008, defendants Steven Frankenbach, Vincent Cagno, and Eric Sickles, officers in defendant Town of Southampton's police department, were assigned to secure a residence in Southampton, New York for a felony investigation. (Defs.' 56.1 ¶ 1.) Some time that morning, defendant Frankenbach observed a woman, Danielle Giannini, sleeping on the living room couch on the first floor with a "crack pipe" in her hand.[4] (*Id.* ¶ 4.) According to defendant Sickles's deposition testimony, defendant Cagno alerted defendant Sickles as to Giannini, and

---

against defendant Linda A. Kabot. (Pl's. Br. at 17 n.5.)

[2] At oral argument, plaintiff's counsel agreed that due to defects in the notice of claim, the claims of negligence and wrongful death can be asserted only against the Town of Southampton.

[3] In addition, although the parties' Rule 56.1 statements contain specific citations to the record to support their statements, the Court has cited to the Rule 56.1 statements, rather than the underlying citation to the record, when utilizing the 56.1 statements for purposes of this summary of facts.

[4] Defendants assert that officers observed Giannini at "940 hours," but plaintiff alleges the time is not supported by admissible evidence. (Defs.' 56.1 ¶ 4; Pl's. 56.1 ¶ 4.) In any event, this dispute is immaterial for purposes of the resolution of this motion. Plaintiff argues that Bradway's arrest took place sometime prior to at least 10:15 a.m. based upon police reports (*see* Pl's. Ex. J, Officer William Kiernan Supplementary Report; Pl's. Ex. L, Officer Peters Supplementary Report), and thus the Court will assume, for purposes of this motion, that the approximate time of Bradway's arrest was 10:15 a.m.

defendant Sickles escorted Giannini to the dining room. (Pl's. Ex. A, Sickles Tr. at 52:24-53:6.) Defendant Sickles's further testified that Bradway, who was also asleep in the living room, awoke at the time Giannini was placed under arrest. (*Id.* at 54:14-21.) Bradway was also escorted into the dining room. (Defs.' 56.1 ¶ 6.)

According to defendant Sickles, he observed a "plastic baggy" containing a solid substance believed to be crack cocaine on the couch where Bradway had been sitting. (Pl's. Ex. A, Sickles Tr. at 56:23-57:11.) Defendant Cagno placed Bradway in handcuffs. (Defs.' 56.1 ¶ 8.) During their depositions, defendants Sickles and Cagno both testified that, sometime before the events that follow, defendant Peters arrived at the residence. (Pl's. Ex. A, Sickles Tr. at 61:25-62:21; Pl's. Ex. B, Cagno Tr. at 43:12-14.) Defendant Peters testified, during his deposition, that Bradway confirmed to him that defendant Peters had arrested Bradway three years earlier for criminal possession of a controlled substance. (Pl's. Ex. K, Peters Tr. at 32:13-33:7; 37:9-11.)

At the time he placed Bradway in handcuffs, defendant Cagno observed Bradway wipe his mouth directly on his pant leg and noticed a white residue; he then observed Bradway chewing on something. (Defs.' 56.1 ¶ 9.) Defendant Peters testified that he witnessed Bradway ingest the item he was chewing.[5] (Pl's. Ex. K, Peters Tr. at 43:10-13.) Defendant Peters further testified that he suspected Bradway was chewing on crack cocaine because of the residue coming down from Bradway's chin. (Pl's. Ex. K, Peters Tr. at 41:15-25.) Defendant Cagno commanded Bradway to spit out whatever it was that he was chewing on. (Defs.' 56.1 ¶ 10.)

After Bradway refused to comply with defendant Cagno's commands, defendant Cagno placed his left hand behind Bradway's head and his right hand under his chin in an attempt to prevent him from swallowing. (Defs.' 56.1 ¶ 11.) Defendant Sickles informed Bradway that, if he did not comply, he would be "tased." (Defs.' 56.1 ¶ 12.) Bradway continued to disregard the commands of the defendant officers, and defendant Sickles deployed his Taser while it was in drive-stun mode. (Defs.' 56.1 ¶ 13.) According to defendant Sickles's Supplementary Report dated June 9, 2008, Sickles deployed his Taser to prevent Bradway from "ingesting a lethal dose of cocaine."[6] (Pl's. Ex. E, Sickles Supplementary Report.) Bradway spit out a plastic bag onto the table in front of him, but continued to chew. (Defs.' 56.1 ¶ 14.)

Bradway was then again advised to spit out whatever it was he was still chewing on, or he would be "tased" again. (Defs.' 56.1 ¶ 15.) Bradway again refused to comply and began to chew more vigorously, at which point Officer Sickles deployed his Taser and drive-stunned Bradway a second time. (*Id.*) As a result, Bradway spit out a white substance onto the table in front of him.[7] (Defs.' 56.1 ¶ 16.) Defendants have stated that either after being tased the first or

---

[5] According to the Southampton Town Police Department Arrest Report Medical Form, Bradway "was observed ingesting a quantity of cocaine." (Pl's. Ex. M, Arrest Medical Report Form.)

[6] Defendant Sickles testified that a "lethal dose of cocaine" is "too much cocaine for the body to handle." (Pl's. Ex. A, Sickles Tr. at 117:12-15.)

[7] Defendant Sickles testified that, after Bradway spit out what had been in his mouth, defendant Sickles became aware that Bradway had ingested cocaine. (Pl's. Ex. A, Sickles Tr. at 74:11-17.) It is unclear from Sickles's testimony whether it was after Bradway spit out the bag or after he spit out the white substance.

second time, Bradway stated "Okay, okay, I'll spit it out. I just didn't want you to have my cocaine." (Pl's. Ex. B, Cagno Tr. at 41:5-10; Pl's. Ex. F, Cagno Supplementary Report.) According to Defendant Sickles's Supplementary Report, the officers asked Bradway how much of the substance was ingested and he stated about two to three grams.[8] (Pl's. Ex. E, Sickles Supplementary Report.)

Defendant Peters testified that defendant Sickles informed Bradway that he would have to be taken to the hospital; his Supplementary Report also indicates that defendant Sickles stated he would need to remove him to the hospital for his own safety. (Pl's. Ex. K, Peters Tr. at 44:25-45:4; Pl's. Ex. L, Peters Supplementary Report.) According to a Suffolk County Police Department Supplementary Report, Tiffany Inversa, who defendant Cagno testified had been in the dining room at some point during Bradway's arrest, stated that she heard the police say, "He's all f***ed up, he needs to go to the hospital." (Pl's. Ex. N, Suffolk County Supplementary Report; Pl's. Ex. B, Cagno Tr. at 44:5-25.)

According to defendant Sickles's deposition testimony, defendant Sickles called defendant James Kiernan to "fill him in on what had occurred." (Pl's. Ex. A, Sickles Tr. at 71:25-72:1.) Defendant Sickles testified that defendant James Kiernan asked about Bradway's condition, and defendant Sickles stated "that he didn't appear like he was in any sort of distress." (Pl's. Ex. A, Sickles Tr. at 73:7-12.) According to defendant James Kiernan's Supplementary Report, defendant Sickles reported to defendant James Kiernan that he believed Bradway may have swallowed cocaine. (Pl's. Ex. D, James Kiernan Supplementary Report.) Defendant James Kiernan directed that Bradway be brought to police headquarters. (Defs.' 56.1 ¶ 18.)

Defendant William Kiernan testified that he arrived at the residence to transport Bradway to headquarters around 10:30 a.m.[9] (Pl's. Ex. R, William Kiernan Tr. 24:9-16.) Defendant William Kiernan transported Bradway to police headquarters and testified that Bradway appeared to be in normal condition. (Defs.' 56.1 ¶ 20.) According to defendant William Kiernan's Supplementary Report, Bradway arrived at police headquarters at 10:55 a.m. (Pl's. Ex. J, Officer Wlliam Kiernan Supplementary Report.) Defendant William Kiernan testified that because Bradway's clothing was covered in white powder, Bradway put on a jumpsuit so that his clothing could be put in an evidence bag. (Pl's. Ex. R, William Kiernan Dep. 34:9-15.) Defendant James Kiernan conducted Bradway's arrest processing. (Defs.' 56.1 ¶ 21.) Defendant James Kiernan took Bradway's pedigree information, name, date of birth, and other information and recalled at his deposition that Bradway initially appeared to be in normal physical and mental condition and not under the influence of any narcotic. (Defs.' 56.1 ¶ 22.) According to defendant James Kiernan's Supplementary Report, Bradway informed Defendant James Kiernan that he swallowed "from one gram to 'under four grams'" of cocaine. (Pl's. Ex. D, James Kiernan Supplementary Report.)

As defendant James Kiernan's conversation with Bradway progressed, he

---

[8] Defendant Peters testified that Bradway stated that he swallowed "'just a little bit. Maybe a gram or two.'" (Pl's. 56.1 ¶ 23.)

[9] Defendant Sickles testified that, as he was escorting Bradway to the patrol car, Bradway stated that "he was okay, and he also mentioned to me that he has family that works at the hospital and didn't want to see him there arrested." (Pl's. Ex. A, 79:16-20.)

4

began to notice that Bradway was giving inconsistent answers. (Defs.' 56.1 ¶ 23.) Defendant James Kiernan decided to transport Bradway to the hospital. *Id.* Defendant James Kiernan testified that he called defendant Sickles to bring Bradway to the hospital. (Pl.'s Ex C, James Kiernan Tr. 34:22-35:20; Pl's. Ex. A, Sickles Tr. 84:10-16.) Defendant James Kiernan testified that it took defendant Sickles "less than 20 minutes" to arrive back at the police headquarters. (Pl's. Ex. C, James Kiernan Tr. 35:22-25.) Defendant James Kiernan testified that Bradway initially refused to go to the hospital and defendant James Kiernan talked to Bradway about forcing him to go to the hospital. (*Id.* at 36:8-25.)

Defendant James Kiernan testified that Bradway was transported to Peconic Bay Medical Center in Riverhead, New York around 11:30 a.m. (*Id.* at 34:17-20; 38:12-16.) Bradway was admitted to Peconic Bay Medical Center at 12:04 p.m. (Defs.' 56.1 ¶ 25.) According to Doctor Rajesh Patel's "Report of Consultation," upon arrival at the emergency room, Bradway was "extremely agitated." (Pl's. Ex. U, Report of Consultation by Rajesh Patel, M.D.) According to the Peconic Bay Medical Center Encounter and Treatment Health Care Practitioner Note, dated June 9, 2008, by 12:40 p.m., hospital staff reported Bradway as "agitated" and "unable to contribute to HPI." (Pl's. Ex. T, Peconic Bay Medical Center Encounter and Treatment Health Care Practitioner Note.) Bradway informed hospital staff that he had ingested four to five grams of cocaine after the police woke him up.[10] (Pl's. Ex. U,

---

[10] Another hospital document, dated June 9, 2008 at 12:04 p.m. categorizes Bradway's ingestion of the 4 to 5 grams of cocaine as occurring seven hours earlier in an attempt to get high. (Pl's. Ex. S, Peconic Bay Medical Center Emergency Nursing Record.)

Report of Consultation by Rajesh Patel, M.D.) According to an Initial Assessment performed at the hospital, Bradway appeared in "severe distress," was "agitated" and exhibited "tachycardia." (Pl's. Ex. S, Peconic Bay Medical Center Emergency Nursing Record.) According to the Peconic Bay Medical Center Emergency Nursing Record, Ativan was administered at 12:50 p.m. (*Id.*; *see also* Pl's. Ex. U, Report of Consultation by Rajesh Patel, M.D.)

According to hospital records, Bradway's first seizure occurred at about 1:05 p.m. (Pl's. Ex. S, Peconic Bay Medical Center Emergency Nursing Record; Pl's. Ex. U, Report of Consultation by Rajesh Patel, M.D.) According to the Peconic Bay Medical Center Progress Notes, at 3:45 p.m., "seizure activity" was noted "x5 minutes." (Defs.' Ex. M, Peconic Bay Medical Center Progress Notes.) Bradway was transferred to the ICU around 6:00 p.m. (*Id.*) According to the Peconic Bay Medical Center Progress Notes, between 6:53 and 6:58 p.m., a "Code Blue" was called. (*Id.*) Bradway was pronounced dead at 7:13 p.m. (Defs.' 56.1 ¶ 29.) The Suffolk County Medical Examiner's "Report of Autopsy" indicates that Bradway's cause of death was "seizures and multiple systems failure" due to "acute cocaine intoxication." (Pl's. Ex. W, Suffolk County Office of the Medical Examiner Report of Autopsy.)[11]

II. STANDARD OF REVIEW

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(a), a court may only grant a motion for summary judgment if "the movant shows that there is no genuine

---

[11] Plaintiff notes that Southampton Hospital is 4.68 miles, or approximately 13 minutes, from the arrest scene at 18 Greenfield Road. (Pl.'s Ex. X, Yahoo! Maps Search.)

5

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of showing that he or she is entitled to summary judgment. *Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (quoting *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996)); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "'must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*'" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (emphasis in original)). As the Supreme Court stated in Anderson, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50, 106 S. Ct. 2505 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247-48, 106 S. Ct. 2505 (emphasis in original). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth "'concrete particulars'" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir.1984) (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978)). Accordingly, it is insufficient for a party opposing summary judgment "'merely to assert a conclusion without supplying supporting arguments or facts.'" *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (quoting *Research Automation Corp.*, 585 F.2d at 33).

### III. DISCUSSION

#### A. Plaintiff's Section 1983 Deliberate Indifference Claim

##### 1. Legal Standard

To prevail on a claim under Section 1983, a plaintiff must show: (1) the deprivation of any rights, privileges, or immunities secured by the Constitution and its laws; (2) by a person acting under the color of state law. 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993).

There is no dispute for purposes of this motion that defendants were acting under color of state law. The question presented, therefore, is whether defendants' alleged conduct deprived Bradway of his Fourteenth Amendment rights. Plaintiff alleges Bradway's Fourteenth Amendment rights were violated when defendants failed to promptly bring Bradway to the hospital after he ingested cocaine in their presence and exhibited signs of distress.

"Claims for deliberate indifference to a serious medical condition or other serious threat to the health or safety of a person in custody should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment." *Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009). Thus, the Court analyzes plaintiff's deliberate indifference claim under Eighth Amendment jurisprudence.

"[D]eliberate indifference to serious medical needs of prisoners constitutes the unecessary and wanton infliction of pain proscribed by the Eighth Amendment" and therefore "states a cause of action under § 1983." *Estelle v. Gamble*, 429 U.S. 97, 104-05, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976) (quotation marks and citation omitted). As the Second Circuit has explained,

> [t]he Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody. Moreover, under 42 U.S.C. § 1983, prison officials are liable for harm incurred by an inmate if the officials acted with "deliberate indifference" to the safety of the inmate. However, to state a cognizable section 1983 claim, the prisoner must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice.

*Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996) (citations omitted). Within this framework, "[d]eliberate indifference to a prisoner's serious medical needs constitutes cruel and unusual punishment, in violation of the Eighth Amendment, as made applicable to the states through the Fourteenth Amendment." *Bellotto v. Cnty. of Orange*, 248 Fed. App'x 232, 236 (2d Cir. 2007). Thus, according to the Second Circuit,

> [d]efendants may be held liable under § 1983 if they ... exhibited deliberate indifference to a known injury, a known risk, or a specific duty, and their failure to perform the duty or act to ameliorate the risk or injury was a proximate cause of plaintiff's deprivation of rights under the Constitution. Deliberate indifference is found in the Eighth Amendment context when a prison supervisor knows of and disregards an excessive risk to inmate health or safety.... Whether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause.

*Ortiz v. Goord*, 276 Fed. App'x 97, 98 (2d Cir. 2008) (citations and quotation marks omitted); *see also Harrison v. Barkley*, 219 F.3d 132, 137 (2d Cir. 2000) ("Deliberate

7

indifference will exist when an official 'knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it.'") (quoting *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)); *Curry v. Kerik*, 163 F. Supp. 2d 232, 237 (S.D.N.Y. 2001) ("'[A]n official acts with the requisite deliberate indifference when that official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (internal quotation marks omitted))).

In particular, the Second Circuit has set forth a two-part test for determining whether a prison official's actions or omissions rise to the level of deliberate indifference:

> The test for deliberate indifference is twofold. First, the plaintiff must demonstrate that he is incarcerated under conditions posing a substantial risk of serious harm. Second, the plaintiff must demonstrate that the defendant prison officials possessed sufficient culpable intent. The second prong of the deliberate indifference test, culpable intent, in turn, involves a two-tier inquiry. Specifically, a prison official has sufficient culpable intent if he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm.

*Hayes*, 84 F.3d at 620 (internal citation omitted); *see also Phelps v. Kapnolas*, 308 F.3d 180, 185-86 (2d Cir. 2002) (setting forth two-part deliberate indifference test).

In *Salahuddin v. Goord*, the Second Circuit set forth in detail the objective and subjective elements of a medical indifference claim. 467 F.3d 263 (2d Cir. 2006). In particular, with respect to the first, objective element, the Second Circuit explained:

> The first requirement is objective: the alleged deprivation of adequate medical care must be sufficiently serious. Only deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation. Determining whether a deprivation is an objectively serious deprivation entails two inquiries. The first inquiry is whether the prisoner was actually deprived of adequate medical care. As the Supreme Court has noted, the prison official's duty is only to provide reasonable care. Thus, prison officials who act reasonably [in response to an inmate-health risk] cannot be found liable under the Cruel and Unusual Punishments Clause, and, conversely, failing to take reasonable measures in response to a medical condition can lead to liability.

8

Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner. For example, if the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious. Factors relevant to the seriousness of a medical condition include whether a reasonable doctor or patient would find [it] important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain. In cases where the inadequacy is in the medical treatment given, the seriousness inquiry is narrower. For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone. Thus, although we sometimes speak of a serious medical condition as the basis for an Eighth Amendment claim, such a condition is only one factor in determining whether a deprivation of adequate medical care is sufficiently grave to establish constitutional liability.

467 F.3d at 279-80 (citations and quotation marks omitted); *see also Jones v. Westchester Cnty. Dep't of Corr. Med. Dep't*, 557 F. Supp. 2d 408, 413-14 (S.D.N.Y. 2008).

With respect to the second, subjective component, the Second Circuit further explained:

> The second requirement for an Eighth Amendment violation is subjective: the charged official must act with a sufficiently culpable state of mind. In medical-treatment cases not arising from emergency situations, the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health. Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law. This mental state requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result. Although less blameworthy than harmful action taken intentionally and knowingly, action taken with reckless

9

indifference is no less actionable. The reckless official need not desire to cause such harm or be aware that such harm will surely or almost certainly result. Rather, proof of awareness of a substantial risk of the harm suffices. But recklessness entails more than mere negligence; the risk of harm must be substantial and the official's actions more than merely negligent.

*Salahuddin*, 467 F.3d at 280 (citations and question marks omitted); *see also Jones*, 557 F. Supp. 2d at 414. The Supreme Court has stressed that

> in the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute "an unnecessary and wanton infliction of pain" or to be "repugnant to the conscience of mankind." Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment.

*Estelle v. Gamble*, 429 U.S. at 105-06 (internal citations omitted); *see also Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003) ("A showing of medical malpractice is therefore insufficient to support an Eighth Amendment claim unless the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces a conscious disregard of a substantial risk of serious harm." (internal quotations omitted)); *Harrison v. Barkley*, 219 F.3d 132, 139 (2d Cir. 2000) (a medical practitioner who "delay[s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not evince the culpability necessary for deliberate indifference).

2. Application

a. Objective Prong

The evidence in this case, taken in the light most favorable to the plaintiff, is sufficient to raise a genuine issue of material fact as to whether the alleged deprivation of adequate medical care was sufficiently serious. "Because '[t]he objective component of an Eighth Amendment claim is … [necessarily] contextual' and fact-specific, the serious medical need inquiry must be tailored to the specific circumstances of each case." *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003) (quoting *Hudson v. McMillian*, 503 U.S. 1, 8, 112 S. Ct. 995 (1992)) (citation omitted). The relevant inquiry centers on the "particular risk of harm faced by a prisoner due to the challenged deprivation of care." *Id.* at 186.

Plaintiff has produced evidence that Bradway was not provided with immediate medical care after the defendant officers

observed Bradway ingest cocaine. First, plaintiff has produced evidence that, after Bradway ingested the cocaine, Bradway admitted to the defendant officers that he ingested up to three grams of cocaine.[12] (Pl's. Ex. E, Sickles Supplementary Report.) Moreover, plaintiff has produced evidence from her expert witness, Dr. Blum, that "ingestion, of any non-labeled substance, must be treated as a life threatening medical emergency." (Pl's Ex. O, Blum Report.) Plaintiff has also produced evidence that, rather than bring Bradway to the hospital immediately, officers brought Bradway back to the station. Once at the station, defendant James Kiernan determined that Bradway needed to be taken to the hospital because of his responses to questions, but there is evidence that there was up to a 20 minute delay until defendant Sickles returned to bring Bradway to the hospital. (Pl's. Ex. C, James Kiernan Tr. 34:22-35:25.) Dr. Blum testified that a delay in treatment of an hour can allow an ingested substance to be absorbed, and that "the faster an unknown substance is removed from the body, or at least neutralized, the less that's going to happen." (Pl's. Ex. Q, Blum Tr. at 50:15-25.) Finally, there is evidence that Bradway died due to the seizures and systems failure brought on by acute cocaine intoxication. (Pl.'s Ex. W, Suffolk County Office of the Medical Examiner Report of Autopsy.)

Thus, if this evidence is credited and all reasonable inferences are drawn in plaintiff's favor, the evidence is sufficient to raise a genuine issue of material fact as to whether Bradway was denied prompt medical care after he ingested the cocaine, due to the defendants' delays in bringing Bradway to the hospital. Plaintiff has also presented evidence to survive summary judgment on the issue of whether the delay in treating Bradway was sufficiently serious to his health, given the risks and effects of cocaine ingestion and Bradway's ultimate death due to acute cocaine intoxication. In short, because plaintiff has presented sufficient evidence to raise a genuine issue of fact as to whether there was a substantial risk of serious harm to Bradway, including a risk of death due to defendants' deprivation of prompt medical care, plaintiff's Fourteenth Amendment claim survives summary judgment on the objective prong of this analysis.

b. Subjective Prong

The evidence in this case, taken in the light most favorable to the plaintiff, also is sufficient to create a genuine issue of fact as to the subjective prong – namely, whether the defendants acted with sufficient culpable intent because the defendants were aware of, and consciously disregarded, Bradway's medical needs.

First, plaintiff has presented evidence that the defendant officers were aware that Bradway ingested cocaine, and that the defendant officers were aware that he ingested between two to three grams of cocaine. (Pl's. Ex. E, Sickles Supplementary Report.) Second, plaintiff has presented evidence, through the statement of Tiffany Inversa, who had been in the dining room at some point during Bradway's arrest, that Bradway was exhibiting signs of distress due to the cocaine ingestion at the residence where he was arrested and that officers believed he needed to go to the hospital at that point. In particular, according to an interview report, Ms. Inversa stated that, at some point during Bradway's arrest at the residence, she heard police say, "He's all f***ed up, he needs to go to the hospital." (Pl's. Ex. N, Suffolk

---

[12] Plaintiff has also presented evidence that medically, only a dose of 200-400 milligrams of cocaine is considered "therapeutic." (Pl's. Ex. O, Blum Report.)

County Supplementary Report.) Third, plaintiff has presented evidence that at least one of the defendant officers stated that Bradway needed to go to the hospital. In particular, there is evidence that defendant Sickles told Bradway "that he would have to remove him to the hospital for his own safety due to swallowing cocaine." (Pl's. Ex. L, Peters Supplementary Report; *see also* Pl's. Ex. K, Peters Tr. at 44:25-45:4.)[13]

If all of the plaintiff's evidence is credited, and all reasonable inferences are drawn in plaintiff's favor, a rational jury could conclude (1) that the defendants were aware of Bradway's serious medical needs at the residence in Southampton based upon how much cocaine he told them he ingested (that is, two to three grams) and their belief (if Ms. Inversa is credited) that he needed to go to the hospital; (2) rather than transporting Bradway to the hospital immediately (which was approximately 13 minutes away), the defendant officers transported Bradway to police headquarters; and (3) in doing so, the officers consciously disregarded Bradway's needs. Therefore, summary judgment is unwarranted with respect to the "deliberate indifference" claim as it relates to the actions of the individual defendants at the arrest scene with respect to the decision not to transport him to the hospital.

Similarly, there are disputed facts that preclude summary judgment as to the "deliberate indifference" claim as it relates to the events at the police station. First, there is evidence that, once at the station, defendant James Kiernan realized that Bradway was giving conflicting answers and determined that Bradway needed to be transported to the hospital. (Defs.' 56.1 ¶ 23.) Second, there is evidence that, instead of having Bradway transported immediately, defendant James Kiernan waited for defendant Sickles to arrive at the station to transport Bradway, which took up to 20 minutes. (Pl's. Ex. C, James Kiernan Tr. 34:22-35:25.) Once again, if all the evidence is credited and all reasonable inferences drawn in plaintiff's favor, the totality of the evidence is sufficient to raise a genuine issue of material fact as to whether the failure to immediately transport Bradway, once the decision was made that he need to go to the hospital, constituted a conscious disregard for Bradway's needs.

In sum, there is disputed evidence that the individual defendants, with knowledge of Bradway's ingestion of a substantial amount of cocaine at the time of his arrest at approximately 10:15 a.m., took him to the police station and failed to take him to the hospital until approximately 12:04 p.m. The evidence, viewed in the light most favorable to plaintiff, is sufficient for the medical indifference claim to survive summary judgment.

In reaching this decision, the Court is obviously not suggesting (as defendants suggested at oral argument) that a medical indifference claim will potentially lie simply because officers fail to take every

---

[13] Additionally, defendant Sickles testified that it was necessarily to deploy his Taser in order to prevent Bradway from ingesting a lethal dose of cocaine. (Pl's. Ex. E, Sickles Supplementary Report.) Drawing inferences in Plaintiff's favor, a rational jury could find that Sickles's use of the Taser demonstrates defendant Sickles's knowledge of the serious risks of cocaine ingestion. As noted *supra* in the factual background section, there is some evidence from the officers' deposition testimony that Bradway was not transported to the hospital from the arrest scene because he stated he was fine, did not want to be transported, and had no visible signs of distress. However, as discussed *infra*, the Court must construe the evidence most favorably to plaintiff, as the non-moving party, for purposes of summary judgment.

intoxicated arrestee to the hospital at the time of the arrest for treatment. Such a rule would be absurd and, given the number of arrestees who are intoxicated at the time of arrest, would turn hospitals into arrest processing centers. As the Eleventh Circuit correctly and succinctly noted, "[t]he Constitution does not require an arresting police officer or jail official to seek medical attention for every arrestee or inmate who appears to be affected by drugs or alcohol." *Burnette v. Taylor*, 533 F.3d 1325, 1333 (11th Cir. 2008); *see also Estate of Lawson ex rel. Fink v. City of Hamilton*, No. C-1-07-927, 2009 WL 1444556, at *16 (S.D. Ohio May 21, 2009) ("The Constitution does not require an officer to provide medical assessment and care to every intoxicated person he arrests, regardless of the degree of impairment."). Instead, much more evidence must be present for a plausible constitutional violation to exist and for a medical indifference claim of this nature to survive summary judgment. In particular, there generally must be evidence that the officers are aware of the ingestion of large quantities of drugs or other intoxicants which, due to the quantities, pose a serious or life-threatening danger to the arrestee, and/or there were obvious signs of distress from the ingestion.

In the instant case, as discussed in detail above, there is evidence that (1) the officers knew that Bradway had just swallowed possibly two to three grams of cocaine; (2) one officer (according to Ms. Inversa) stated at the arrest scene that Bradway was "f***ed up" and needed to go to the hospital, suggesting that Bradway was already exhibiting signs of distress requiring hospitalization;[14] (3) after arriving at the police station, he exhibited signs that led an officer to conclude that he needed hospitalization, but that an additional period of time of up to 20 minutes elapsed before he was transported to the hospital as the police waited for an officer to return from the field transport him; (4) a total period of time of approximately 1 hour and 45 minutes elapsed from the time of ingestion of the drugs until the police arrived at the hospital; and (5) within one hour of arriving at the hospital, Bradway had his first seizure and died later that evening from seizures and multiple systems failure due to acute cocaine intoxication. Given that combination of evidence, and all reasonable inferences drawn therefrom, there is sufficient evidence for plaintiff's claim to survive summary judgment. *See, e.g., Border v. Trubull Cnty. Bd. of Comm'rs*, 414 Fed. App'x 831, 838 (6th Cir. 2011) ("In the instant case . . . viewing the evidence in the light most favorable to plaintiffs, [the officer's] notation on the altered forms that [detainee] appeared to be 'under the influence of barbiturates, heroin or other drugs' and suffered a recent head injury, coupled with [the detainee's] signs of physical incapacity, severe intoxication and obvious

---

[14] The Court notes that the presence of signs of distress at the scene (as suggested by Ms. Inversa's statement) is not dispositive of the summary judgment determination because an argument could be made that, if the officers were aware of the large quantity of cocaine that had just been ingested (approximately two to three grams), and were aware of the fact that it may take some period of time for the drug to enter the bloodstream at which point it may be too late medically to address the situation, Bradway should have been brought to the hospital even before the signs of distress became visible. In fact, Officer Cagno indicated during his deposition that a potential drug overdose is a scenario that requires the arrestee to be taken for immediate medical attention. (Pl.'s Ex. B, Vincent Cagno Tr. 15:5-10.). This statement, drawing all reasonable inferences in plaintiff's favor, suggests that the officers were aware that a substantial drug overdose requires medical attention even before signs of severe distress.

disorientation witnessed by the inmates during the period [the officer] was interacting with [the detainee], sufficiently establish from an objective standpoint that a serious medical need existed and, in addition, that a reasonable jury could conclude that [the officer] was 'aware of facts from which the inference could be drawn that a substantial risk of serious harm existed[ed] and [he] ignored that risk.'") (quoting *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 899 (6th Cir. 2004)); *Dean v. City of Fresno*, 546 F Supp.2d 798, 814 (E.D. Cal. 2008) ("A rationale [sic] jury could find the officers' conduct to be a form of inaction that amounts to deliberate indifference. Although the officers maintain that they only thought that [the detainee] had cocaine in his mouth, that they did not think that [the detainee] needed medical care, and that if [the detainee] had said he had swallowed cocaine that they would have obtained medical aid, a rationale [sic] jury could look at the totality of the circumstances and conclude that the officers had actual knowledge that [the detainee] had swallowed cocaine and were deliberately indifferent to [the detainee's] condition.").

As to this issue, the Court has conducted independent research and carefully examined other cases that have dealt with the ingestion of drugs in the medical indifference context. In many of the cases that grant summary judgment for the defendants, the defendants were unaware of the actual amount of drugs consumed and/or the plaintiff exhibited no signs of distress. *See, e.g., Dillard v. Florida Dep't. of Juvenile Justice*, 427 Fed. App'x 809, 811-12 (11th Cir. 2011) (arrestee informed officer that he only consumed a small amount of cocaine several hours before admission to detention center and the only sign of distress was an isolated report that arrestee was sweating and shaking forty-five minutes before seizures began); *Brown v. Middleton*, 362 Fed. App'x 340, 344-45 (4th Cir. 2010) (though officers pulled plastic bag of cocaine from arrestee's mouth, officers did not witness ingestion, arrestee repeatedly denied ingesting drugs, and arrestee behaved normally); *Weaver v. Shadoan*, 340 F.3d 398, 411 (6th Cir. 2003) (officers did not see or have knowledge that arrestee ingested cocaine and arrestee denied ingesting drugs, and when arrestee appeared to become ill, paramedics checked arrestee and found no symptoms of drug ingestion). Here, in contrast, plaintiff has produced evidence that the defendant officers watched Bradway ingest cocaine, Bradway admitted to ingesting a large amount of cocaine, Bradway exhibited signs of distress, and defendants failed to act promptly on two occasions in bringing Bradway to the hospital, thus rendering summary judgment inappropriate. The Court is unaware of any federal cases involving analogous circumstances where summary judgment has been granted on a medical indifference claim.

Finally, defendants argued in their papers and at oral argument that there is also evidence in the record that, at the arrest scene, Bradway did not want medical attention, said that he was fine, and exhibited no signs of distress. Defendants also argue that there is inconsistent evidence in the record regarding defendants' knowledge as to precisely how much cocaine Bradway had ingested. The Court recognizes that there is evidence in the record that, if credited, undermines the version of events being offered by plaintiff in opposition to the motion. However, for purposes of the summary judgment, the Court must avoid credibility determinations and look at the evidence in the light most favorable to the plaintiff. Under that standard, there are genuine issues of disputed fact (and the reasonable inferences to be drawn from such facts) on this claim

14

that require resolution by a jury. Similarly, the fact that there is evidence that he declined to go to the hospital at the time of arrest is not a dispositive fact for purposes of summary judgment in this case. There are certainly circumstances where an intoxicated person's statement that he or she does not need medical treatment should not be honored because it is inconsistent with other objective facts indicating that hospitalization is clearly necessary. Thus, the testimony of the police officers that Bradway declined to go to the hospital at the arrest scene and initially at the police station is not dispositive for purposes of summary judgment in light of the entire record.

## B. Qualified Immunity

The individual defendants argue, in the alternative, that they are entitled to summary judgment on qualified immunity grounds with respect to the medical indifference claim under the Fourteenth Amendment. For the reasons set forth below, however, the Court denies summary judgment to the individual defendants on this ground because disputed issues of fact exist that must be resolved before the issue of qualified immunity can be decided in this case.

### 1. Legal Standard

According to the Second Circuit, government actors may be shielded from liability for civil damages if their "conduct did not violate plaintiff's clearly established rights, or if it would have been objectively reasonable for the official to believe that his conduct did not violate plaintiff's rights." *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 385 (2d Cir. 2003); *see also Fielding v. Tollaksen*, 257 Fed. App'x 400, 401 (2d Cir.2007) (explaining that government officers "are protected by qualified immunity if their actions do not violate clearly established law, or it was objectively reasonable for them to believe that their actions did not violate the law."). "A right is clearly established when the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.... The unlawfulness must be apparent." *Connell v. Signoracci*, 153 F.3d 74, 80 (2d Cir.1998) (quotation marks omitted). In addition, the Second Circuit has repeatedly stated that qualified immunity only protects officials performing "discretionary functions." *See Simons v. Fitzgerald*, 287 Fed. App'x 924, 926 (2d Cir.2008) ("'Qualified immunity shields government officials performing discretionary functions from liability for civil damages . . . .'" (quoting *Zellner v. Summerlin*, 494 F.3d 344, 367 (2d Cir.2007))); *Piscottano v. Town of Somers*, 396 F. Supp. 2d 187, 208 (D. Conn. 2005) ("'The qualified immunity doctrine protects government officials from civil liability in the performance of discretionary functions as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated.'" (quoting *Lee v. Sandberg*, 136 F.3d 94, 100 (2d Cir.1997))).

As the Second Circuit has also noted, "[t]his doctrine is said to be justified in part by the risk that the 'fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties.'" *McClellan v. Smith*, 439 F.3d 137, 147 (2d Cir. 2006) (quoting *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir.1999)). Thus, qualified immunity is not merely a defense, but is "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S. Ct. 2806, 86 L. Ed. 2d 411 (1985). Accordingly, courts should determine the availability of qualified immunity "at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224,

227, 112 S. Ct. 534, 116 L. Ed. 2d 589 (1991).

With respect to the summary judgment stage in particular, the Second Circuit has held that courts should cloak defendants with qualified immunity at this juncture "only 'if the court finds that the asserted rights were not clearly established, or if the evidence is such that, even when it is viewed in the light most favorable to the plaintiff[ ] and with all permissible inferences drawn in [his] favor, no rational jury could fail to conclude that it was objectively reasonable for the defendants to believe that they were acting in a fashion that did not violate a clearly established right.'" *Ford v. McGinnis*, 352 F.3d 582, 597 (2d Cir. 2003) (quoting *Williams v. Greifinger*, 97 F.3d 699, 703 (2d Cir. 1996)); *see also Oliveira v. Mayer*, 23 F.3d 642, 649 (2d Cir. 1994) ("Though [qualified] immunity ordinarily should be decided by the court, that is true only in those cases where the facts concerning the availability of the defense are undisputed; otherwise, jury consideration is normally required." (citations and quotation marks omitted)); *Stancuna v. Sherman*, 563 F. Supp. 2d 349, 356 (D. Conn. 2008) ("Here, the court finds that summary judgment on qualified immunity grounds is inappropriate. As the Second Circuit has held, [w]hen a motion for summary judgment is made in the context of a qualified immunity defense, the question of whether the factual disputes are material is even more critical. As noted above, there are issues of material fact in this case that this court may not decide. These issues of fact are critical to determining whether [the defendant] was operating under a reasonable belief as to what kind of search he was permitted to conduct." (citation and quotation marks omitted)).

2. Application

Here, the Court examines qualified immunity only with respect to plaintiff's surviving 42 U.S.C. § 1983 claim. The Court concludes that the individual defendants have failed to set forth undisputed evidence that establishes that these individual defendants are entitled to qualified immunity; rather there are disputed issues of fact in this case that must be resolved in order to determine whether qualified immunity would be warranted. Accordingly, the individual defendants' motion for summary judgment based on qualified immunity is denied at this juncture.

First, it is axiomatic that the right that plaintiff asserts – namely, Bradway's right under the Fourteenth Amendment to be free from cruel and unusual punishment as a result of a deliberate indifference to serious medical needs – is clearly established. *Estelle*, 429 U.S. at 104-05; *Kaminsky v. Rosenblum*, 929 F.2d 922, 926 (2d Cir. 1991).

Second, as described above, the Court has found that genuine issues of material fact preclude the Court from determining as a matter of law that this clearly established right was not violated. Thus, the critical question is whether it was objectively reasonable for the individual defendants to believe that they were not committing such a violation. The Court declines to so conclude as a matter of law that it was objectively reasonable for defendants to believe they were not violating plaintiff's rights. For example, if the officers knew at the scene that Bradway had just ingested a large quantity of cocaine that would pose a serious or life-threatening danger to his health and/or he was exhibiting clear signs of distress at the scene, it would not have been objectively reasonable to transport him to the police station rather than immediately

to the hospital. Similarly, the objective reasonableness of the officers' conduct after Bradway arrived at the station (including waiting for Officer William Kiernan to arrive back at the headquarters before transporting Bradway to the hospital) will again depend in substantial part upon a combination of their awareness (or lack thereof) of how much cocaine he had ingested, as well as the nature and intensity of the distress he was exhibiting at the police station.[15] In short, there are disputed factual issues as to defendants' conduct relevant to the determination of whether it was objectively reasonable for defendants to believe their acts were lawful. *Kaminsky*, 929 F.2d at 927. These disputed questions of fact preclude the granting of summary judgment on the issue of qualified immunity. *Id.*

### C. Plaintiff's Negligence and Wrongful Death Claims

Plaintiff asserts negligence and wrongful death claims against defendant Town of Southampton. The Town has moved for summary judgment on these claims on several grounds. As set forth below, the Court concludes that summary judgment on these claims against the Town is unwarranted.

In New York, in an action for negligence, a plaintiff must prove three elements: "'(1) the existence of a duty on defendant's part to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof.'" *Alfaro v. Wal–Mart Stores, Inc.*, 210 F.3d 111, 114 (2d Cir. 2000) (quoting *Akins v. Glens Falls City Sch. Distr.*, 53 N.Y.2d 325, 333, 441 N.Y.S.2d 644, 424 N.E.2d 531 (1981)). The negligence determination is also determinative of the plaintiff's wrongful death claim, because "[t]o succeed on a cause of action to recover damages for wrongful death, the decedent's personal representative must establish, *inter alia,* that the defendant's wrongful act, neglect, or default caused the decedent's death." *Eberts v. Makarczuk*, 52 A.D.3d 772, 772–73, 861 N.Y.S.2d 731 (N.Y. App. Div. 2008); *see also Chong v. N.Y. City Tr. Auth.*, 83 A.D.2d 546, 547, 441 N.Y.S.2d 24 (N.Y. 1981) (defining elements of wrongful death claim as: (1) death of a human being; (2) negligence of a defendant causing death; (3) survival of distributees suffering pecuniary loss because of the death; and (4) appointment of a personal representative of the decedent).

#### 1. Municipal Immunity under New York State Law for Negligence of Employees

The Town argues that, because the defendant officers' actions were discretionary, defendant Town of Southampton should be immune from this lawsuit. The Court disagrees, and concludes that the disputed issues of fact preclude a grant of summary judgment in the Town's favor on the negligence claim.

Under New York law, "[m]unicipalities are immune from liability based on the

---

[15] These factual disputes distinguish this situation from other cases where qualified immunity has been granted in ingestion cases. For example, in *Dean v. City of Fresno*, where the court found qualified immunity to exist, the detainee vomited up the rock cocaine that "had not been in [the detainee's] system for very long" and, during the subsequent processing, confirmed he was fine, appeared to act normally, and was processed without incident. 546 F. Supp. 2d at 817. This is in contrast to some of the evidence in this case, discussed *supra*, that officers knew that Bradway had swallowed a substantial amount of cocaine that was still in his system, and also that he exhibited signs of distress at the police headquarters (and possibly at the scene).

17

discretionary acts of their employees – including police officers – provided the actions of the officers were not inconsistent with acceptable police practice." *Bancroft v. City of Mount Vernon*, 672 F. Supp. 2d 391, 408 (S.D.N.Y. 2009). The Town points to the Town of Southampton Police Department General Order § 3-97 which requires that when a police officer "becomes aware that a prisoner is injured or sick, the officer will immediately seek attention."[16] (Defs.' Rep. Br. at 6.) Thus, the Town argues that the Town is entitled to summary judgment because it is clear that this policy was followed. *See* Defs.' Reply Brief, at 7 ("[P]laintiff concedes that Bradway did not exhibit any signs of distress at the time of his arrest and defendants have established that at the first instance of concern of Bradway's well being he was transported to the hospital. Therefore, defendants did not breach any duty owed to Bradway. For the foregoing reasons, plaintiffs' negligence claims fails [sic] as a matter of law.")

However, there are disputed facts that prevent resolution on summary judgment of the issue of whether the actions of the officers in this case were consistent with acceptable police practice. As a threshold matter, Officer Cagno suggested in his deposition that their training dictated that a potential drug overdose required the arrestee to obtain immediate medical assistance. Thus, there is evidence of a policy that knowledge of a substantial overdose of drugs by an arrestee would warrant immediate medical attention, even before severe signs of distress became visible. In any event, as noted *supra*, there is some evidence (based on Ms. Inversa's statement) that the police saw signs of distress at the arrest scene. Moreover, there is evidence that James Kiernan was aware that Bradway was in distress at headquarters, but waited for an officer to come back from the field to transfer him to the hospital, rather than seek immediate medical attention for Bradway. Thus, there are issues of disputed fact that preclude a determination on summary judgment on the issue of whether the Town police officers, consistent with General Order § 3-97 sought immediate medical assistance for Bradway when they first became aware that he was sick. Accordingly, summary judgment on the negligence claim on this ground is denied.

2. Causation

With respect to the negligence and wrongful death claims, defendants assert that the plaintiff is unable to establish a causal link between the defendants' actions and Bradway's death. As set forth below, the Court disagrees, and concludes that plaintiff has produced sufficient evidence to survive summary judgment on the issue of causation.

With respect to causation, plaintiff has presented evidence through the testimony and report of Dr. Blum that time is critical when a person has ingested a significant quantity of an unknown or harmful substance like cocaine. As discussed above, Dr. Blum testified that a delay in treatment of an hour can allow an ingested substance to be absorbed into the body, and that "the faster an unknown substance is removed from the body, or at least neutralized, the less that's going to happen." (Pl's. Ex. Q, Blum Tr. at 50:15-25.) According to Dr. Blum's report, "immediate medical care, upon seeing the ingestion, would have increased [Bradway's] chance of survival. The delay in obtaining medical care for Mr.

---

[16] Defendants have not submitted a copy of this order as an exhibit to their motion. However, the Court assumes the existence of such an Order for purposes of this motion and finds it insufficient to warrant summary judgment for the reasons discussed above.

Bradway was a substantial contributing factor leading to his death." (Pl's. Ex. O, Blum Report.) Therefore, based upon expert testimony of Dr. Blum, plaintiff has set forth sufficient evidence of causation on the state law claims of negligence and wrongful death to survive summary judgment.

In sum, summary judgment on the state law claims for negligence and wrongful death against the Town of Southampton is unwarranted.

## IV. CONCLUSION

For the foregoing reasons, the Court denies defendants' motion for summary judgment on the remaining claims – namely (1) the Section 1983 claim under the Fourteenth Amendment against individual defendants James Kiernan, Eric Sickles, Vincent Cagno, Steve Frankenbach, David Peters, William Kiernan, and Gaspar Montalbano; and (2) the state law claims for negligence and wrongful death against the Town of Southampton.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: December 1, 2011
Central Islip, NY

\* \* \*

Plaintiff is represented by Mark S. Mulholland and Thomas Anthony Telesca, Ruskin Moscou Faltischek PC, East Tower, 15th Floor, 1425 Rexcorp Plaza, Uniondale, NY 11556. The attorneys for the defendants are Jeltje DeJong, Joshua S. Shteierman, and Kelly E. Wright, Devitt Spellman Barrett, LLP, 50 Route 111, Smithtown, NY 11787.